**Lloyd D. KING, et al.,
Plaintiffs–Appellees,**

v.

**ARMSTRONG WORLD INDUSTRIES,
INC., et al., Defendants,**

**The Celotex Corporation,
Defendant–Appellant.**

**No. 89–2640.**

United States Court of Appeals,
Fifth Circuit.

July 12, 1990.

Rehearing and Rehearing En Banc
Denied Aug. 31, 1990.

Donald J. Verolancken, Randa L. Duncan, Elizabeth M. Thompson, Houston, Tex., for defendant-appellant.

Paul L. Sadler, Rex Houston, Welborn, Houston, Adkison, Mann & Sadler, Henderson, Tex., for plaintiffs-appellees.

Before WISDOM, POLITZ and JOHNSON, Circuit Judges.

WISDOM, Circuit Judge:

Celotex Corporation appeals a judgment against it in favor of a number of plaintiffs[1] for injuries arising out of the plaintiffs' exposure to the defendant's asbestos-containing products. The plaintiffs were exposed to asbestos dust in the course of their employment by the defendants. After a ten-day jury trial, the jury awarded the plaintiffs $1,897,500 in compensatory damages. In apportioning the degree of responsibility for causing the injury, the jury held that Celotex, the only non-settling defendant,[2] was responsible to the extent of fifty-five percent. The jury also awarded the plaintiffs $1,550,000 in punitive damages against Celotex. We affirm the judgment.

On appeal, Celotex contends: (1) the district court committed reversible error in three of its evidentiary rulings; (2) there was insufficient evidence to support the apportionment of fifty-five percent causation to Celotex; and (3) the court improperly awarded punitive damages.

I. Evidentiary Rulings

A. *Admission of the Marble Product List*

██ Plaintiff Albert Marble alleged that he had been exposed to the asbestos-containing products of Philip Carey Corporation and its successor, Celotex, among others. In 1985 he was diagnosed as having malignant mesothelioma, and in that same year he filed suit against the defendants. Subsequently, in response to the district court's standing order for asbestos cases, he prepared a list by hand detailing his work history and the asbestos-containing products he used on various jobs. He compiled the list from his own memory and from the recollections of his former co-workers. After he finished the list, but before his deposition or the trial, Marble died. His wife and daughter later made a typewritten copy of the original handwritten list and disposed of the original. The two provided the typed list to the attorney handling the case. At trial, the district judge admitted the typed version of the list in evidence over the objection of defense counsel.

Celotex contends that the list is inadmissible hearsay. Arguing that the product list was the only evidence of Marble's exposure to Celotex or Philip Carey products, a necessary element of the plaintiff's case, the defendant seeks reversal of the judgment.

We need not decide whether the list would be admissible under an exception to the hearsay because Celotex judicially admitted that Marble was exposed to its products. During closing argument, counsel for Celotex discussed the verdict form with the jury. Counsel for the plaintiff had just finished his summation in which he suggested to the jury how it should answer the various interrogatories. Counsel for Celotex addressed the jury and spoke to the issue of exposure:

"Question 2 is were they exposed to our products. And of course, the answer to

---

1. The plaintiffs are Lloyd King, Louan King, Larry Jack Jones, Bess Ellen Jones, Arthur B. Willis, Jr., Molly Willis, Cletus Gresham, Johnny Edward Fowler, and Mary Marble, individually and for the estate of Albert L. Marble.

2. The settling defendants remained parties to the lawsuit by virtue of Celotex's cross-action for contribution.

that one was 'Yes,' and I agree with that."[3] By stating to the jury that it could properly answer the question on exposure affirmatively, counsel for the defendant admitted the point. A "party is bound by the acts of his attorney;"[4] Celotex cannot now complain that the district court admitted evidence establishing a fact that it conceded in argument.

### B. *The Sumner Simpson Papers*

■ Sumner Simpson was the president of the Raybestos–Manhattan Corporation from 1929 to 1953. The "Sumner Simpson papers" consist of correspondence between Simpson and the general counsel for Johns–Manville during the years 1935–1939. The papers tend to show awareness of the dangers of asbestos. No persons employed by Celotex or Philip Carey wrote or received the letters. Celotex objected when the plaintiffs sought to admit the papers into evidence. The trial court overruled the objection and admitted the exhibit with a limiting instruction.[5] Celotex contends that the papers are inadmissible because they are not relevant to its knowledge and that they are unduly prejudicial.[6] We review the district court's evidentiary ruling under an abuse of discretion standard. An erroneous ruling does not merit reversal of a judgment unless "a substantial right of the party" is affected.[7]

Since *Borel v. Fibreboard Paper Products Corp.*,[8] it has been settled that in asbestos cases "the manufacturer is held to the knowledge and skill of an expert". The manufacturer is "obliged to keep abreast of any scientific discoveries and [is] presumed to know the results of all such advances".[9] Accordingly, the scientific knowledge of one manufacturer may help the plaintiff prove that the dangers of asbestos were discoverable at the time of the plaintiff's exposure to the asbestos.[10]

In *Jackson v. Johns–Manville Sales Corp.*,[11] this Court upheld the trial court's admission of the Sumner Simpson papers in evidence against a manufacturer of asbestos products. Celotex argues that *Jackson* is inapplicable because officers of the defendants in that case, Johns–Manville and Raybestos–Manhattan, generated the correspondence. Celotex overlooks that under *Borel* and *Dartez v. Fibreboard Corp.*, such evidence is relevant to the issue of what knowledge was scientifically discoverable by the industry as a whole at a certain time. That the evidence directly shows "only the knowledge of a nonparty does not affect its relevance ...".[12] The trial court did not abuse its discretion in admitting this evidence.

### C. *Deposition of Richard Gaze*

■ Richard Gaze worked as a scientist for Cape Industries, a South African company engaged in the mining of raw asbestos. Gaze began his employment with the company in 1940. In 1975, he was deposed in connection with an action in federal court against his employer. The plaintiff in that case alleged injuries from the raw

---

3. Interrogatory No. 2 asked: "Do you find from a preponderance of the evidence that any of the persons below were exposed to the asbestos-containing products of the Celotex Corporation, to the extent that such exposure was a producing cause of the injury to those persons, or any of them?"

4. *Callip v. Harris County Child Welfare Dep't.*, 757 F.2d 1513, 1522 (5th Cir.1985).

5. "[Y]ou are instructed that the deposition testimony of William S. Simpson ... and Richard Gaze is offered for the limited purpose of showing, if it does, what the industry knew or could have discovered by testing their products."

6. Celotex does not adequately brief the issues whether this evidence should have been excluded on hearsay grounds or for lack of evidence

on authenticity. Accordingly, we do not consider them.

7. *LeBoeuf v. K–Mart Corp.*, 888 F.2d 330 (5th Cir.1989).

8. 493 F.2d 1076, 1089 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

9. *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir.1985).

10. *Id.*

11. 750 F.2d 1314 (5th Cir.1985) (*en banc*).

12. *Dartez,* 765 F.2d at 463.

asbestos that Cape Industries sold to his company for processing. Gaze died. The plaintiffs in this case sought to enter Gaze's deposition in evidence to show the state of scientific knowledge in the field. The trial court admitted the deposition in evidence with a limiting instruction.[13]

We find no abuse of discretion and we uphold the trial court's evidentiary ruling under Rule 804(b)(5) of the Federal Rules of Evidence, the residual hearsay exception for unavailable declarants. That rule provides for the admission of

(5) [a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

There is no dispute that Gaze was "unavailable as a witness" at the time of trial under Rule 804(a)(4). We also find that his testimony possesses "circumstantial guarantees of trustworthiness". As was the case in *Dartez*, Gaze's deposition represents sworn testimony in an adversary proceeding. It is true, as the defendant points out, that the underlying suit for which Gaze was deposed concerned the hazardous effect of raw asbestos. We conclude that this distinction does not affect the trustworthiness or the relevance of the testimony, although it does bear on the weight of the evidence.[14]

The other elements of Rule 804(b)(5) are satisfied as well. The deposition was offered as evidence of a material fact—the state of scientific knowledge on the dangers of asbestos before the plaintiffs' exposure. Gaze's testimony also has probative value on the state of the art. At the time of his testimony, Gaze was the Executive Director and Chief Scientist of Cape Industries. He became aware of the dangers of breathing asbestos dust when he was first employed. Throughout the 1960's, Gaze discussed the hazards with those who purchased asbestos from his company. The deposition carries the stamp of trustworthiness and its admission into evidence in this case serves the interests of justice.

## II. Apportionment of Causation

Celotex contends that the evidence is insufficient to support the jury's finding that Celotex was fifty-five percent responsible for causing the plaintiffs' injuries. The company argues that each plaintiff testified that he was exposed to the asbestos-containing insulation products of several defendants, and that there is no basis for the high percentage of causation the jury attributed to Celotex.[15]

---

**13.** *See* footnote 4.

**14.** "[The] distinction [between raw and finished asbestos] plainly goes more to the weight than to the admissibility of the evidence. A study indicating that exposure to asbestos fibers is likely to cause harm to one group of workers is at least *suggestive of the facts that other groups* of workers who are also exposed to asbestos fibers face similar dangers." *Jackson,* 750 F.2d at 1318.

*But see Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1161 (4th Cir.1986). The court upheld the trial court's exclusion of the Gaze deposition under Rule 804(b)(1). The court found that the defendant/manufacturer of asbestos products would not have a motive to cross-examine Gaze similar to the defendant against whom it was sought to be introduced, a manufacture of asbestos products. The court did not address Rule 804(b)(5).

**15.** Celotex does not address the allocation of causation with respect to Albert Marble.

After the verdict, Celotex moved for an amended judgment, or in the alternative, a new trial. The court denied the motion.

Under Texas law, Celotex is liable only for its share in causing the injury.[16] The burden of allocating causation, however, rests with the defendants, not the plaintiffs.[17] In evaluating Celotex's challenge to the award, "[t]his Court must review all the evidence in the light most favorable to the jury's verdict and must affirm the verdict unless the evidence points 'so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary [conclusion]' ".[18]

The jury had before it substantial evidence of Philip Carey's contribution to the plaintiffs' injuries. During trial, Mr. Gresham testified as to his experience with Philip Carey products, including Air Cell, Alltemp Pipe Covering, and Carey 85 Percent Magnesia Block.[19] With regard to the Philip Carey name, Mr. Gresham testified: "You saw [it] on nearly every job you went on.... I used lots of their products".[20] On cross-examination, Celotex's attorney attempted to demonstrate that Mr. Gresham had considerable work experience with other companies' asbestos-containing products. With regard to Owens–Corning Kaylo, for example, Celotex's attorney asked: "[Y]ou used every bit ... as much Kaylo as you did any product made by my folks, didn't you?" Mr. Gresham responded, "I might have, but I doubt it".[21] Later on cross-examination, Celotex's attorney asked:

"Did you ever use Eagle–Picher 33 Insulating Cement?" Mr. Gresham: "I don't recall that. I might have". Celotex's attorney: "... How about the 43, do you remember that one?" Mr. Gresham: "I don't remember either one of those".[22]

Mr. Fowler's testimony indicated that Philip Carey products were available on virtually every job that he ever worked on.[23] Mr. Willis testified that "Philip Carey is one of the oldest manufacturers of [asbestos-containing] insulation, and I've used it ever since I've been in the trade".[24] Similarly, Mr. King testified, "I've used a whole lot of Philip Carey products".[25] Finally, Mr. Jones testified that he had used Carey 7M–90 Cement and Careytemp Premolded Elbow Insulation.[26]

Of course, Celotex succeeded in proving that other companies were partially liable for the plaintiffs' injuries. The jury responded to this proof by assessing forty-five percent causation against the other companies. A review of the trial record indicates that the evidence was sufficient for a reasonable jury to determine that Celotex was fifty-five percent liable. We uphold the jury's verdict.

### III. Punitive Damages

Celotex advances a number of objections to the jury's award of punitive damages. The defendant argues: (A) the plaintiffs irrevocably waived their claims for punitive damages; (B) Celotex should not be liable for punitive damages for the acts of Philip Carey; and (C) the punitive damage awards violate the United States and Texas Constitutions.[27] We reject these contentions.

A. The consolidated cases that were tried in the district court were origi-

**16.** *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984).

**17.** *Id.*

**18.** *Whatley v. Armstrong World Indus., Inc.,* 861 F.2d 837, 839 (5th Cir.1988) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969)).

**19.** Trial Record at 1330–1332.

**20.** *Id.* at 1326–1327.

**21.** *Id.* at 1366.

**22.** *Id.* at 1371.

**23.** *Id.* at 1417.

**24.** *Id.* at 1463.

**25.** *Id.* at 1576.

**26.** *Id.* at 1655.

**27.** Celotex also maintains that there was no evidence of gross negligence or recklessness on its part. Celotex does not challenge the jury's finding that recklessness on the part of Philip Carey was proved. Our conclusion that Celotex is liable for damages assessed because of Philip Carey's products renders that challenge moot.

nally part of the *Jenkins II*[28] class action brought in the Eastern District of Texas. The *Jenkins II* parties agreed to resolve the cases by alternative dispute resolution (ADR), and a United States Magistrate was appointed Special Monitor to oversee the litigation. If, despite good faith participation in the ADR procedure, no monetary settlement could be reached, the parties' agreement provided for a mini-trial that waived the issues of punitive damages and the state-of-the-art defense.[29] These issues consume substantial resources in virtually every asbestos trial, and much of the evidence submitted in nearly every case is essentially the same. In consideration of the overwhelming number of asbestos cases pending in the Eastern District of Texas, the district court approved the class settlement in the hope that it would expedite resolution of the cases and provide swift justice to present and future litigants.[30]

The ADR procedure turned out to be a failure. The district court found that the parties "failed to meaningfully participate" in the process, removed the cases from the ADR system, and set them for trial. The District Court for the Eastern District of Texas, sitting en banc, approved of this action. Celotex and other defendants petitioned this Court for a writ of mandamus. We denied the writ.

Celotex maintains that the *Jenkins II* agreement was part of the overall *Jenkins* class action agreement, and that the terms of *Jenkins II* are not severable from *Jenkins I*. The *Jenkins I* settlement provides that Celotex pay $93 million to the *Jenkins I* plaintiffs. According to Celotex, this $93 million, to be paid to the *Jenkins I* plaintiffs only, serves as binding consideration for the *Jenkins II* agreement. Celotex further asserts that the *Jenkins II* plaintiffs

irrevocably waived their right to seek punitive damages and therefore could not reassert this right at trial. We find that Celotex's position is without merit.

There is no basis for Celotex's assertion that the *Jenkins I* and *Jenkins II* agreements were interdependent. Throughout the proceedings, the district court treated the *Jenkins I* plaintiffs and the *Jenkins II* plaintiffs separately. The district court order approving the dispute resolution procedure for the *Jenkins II* plaintiffs applied only to the *Jenkins II* plaintiffs. Similarly, none of the *Jenkins II* plaintiffs received a share of the $93 million paid to the *Jenkins I* plaintiffs. No language in the *Jenkins II* agreement implied that the *Jenkins I* and *Jenkins II* agreements were interdependent. Because the *Jenkins I* and *Jenkins II* agreements were never combined, there can be no question of their "severability".

We also reject Celotex's contention that the *Jenkins II* plaintiffs irrevocably waived their right to seek punitive damages. The waiver to which Celotex refers was contingent upon the parties' adherence to the terms of the ADR agreement. The settlement incorporating the ADR agreement, approved by an order of the district court, included as a material term a provision that the parties would "negotiate in good faith and make a bona fide effort to resolve each case by negotiation". When the parties materially breached the agreement by failing to negotiate in good faith, the court was empowered to rescind the order and to place the cases back on the regular docket.[31] The district court did not abuse its discretion.

■ B. Celotex next argues that under Texas law it should not be held liable for the acts of the Philip Carey Corporation, because it purchased the assets of the cor-

**28.** The *Jenkins I* class action was certified by the district court in 1985. *Jenkins v. Raymark Indus., Inc.,* 109 F.R.D. 269 (E.D.Tex.1985), *aff'd* 782 F.2d 468 (5th Cir.1986). *Jenkins II* is a second class action consisting of asbestos cases filed between January 1, 1985 and April 1, 1986. With the sole exception of Celotex, all of the defendants in *Jenkins II* have settled.

**29.** Under the modified trial format, the only issues were to be exposure, medical costs, and damages.

**30.** Fed.R.Civ.P. 23(e) provides that court approval is necessary for the dismissal or compromise of a class action.

**31.** Fed.R.Civ.P. 60(b)(6). *See also Brown v. Clark Equip. Co.,* 96 F.R.D. 166 (D.Me.1982).

poration; it did not merge with the corporation. Celotex's argument is foreclosed by our recent decision in *Aguirre v. Armstrong World Industries, Inc.*[32] In *Aguirre*, Celotex challenged the jury's award of punitive damages against Celotex for the acts of Philip Carey. At trial, however, as in the present case, Celotex did not raise the issue and presented no evidence concerning its corporate history. We therefore refuse to address Celotex's challenge, noting that no "purely legal issue" is presented; "it is all but impossible to determine Celotex's liability without evidence of its corporate history, and if the issue had been raised below the district judge would have had the opportunity to summon further evidence and issue a ruling".[33] We follow that decision today.

■ *Aguirre* also disposes of a related argument. Celotex argues that the punitive damages awarded against it are contrary to the Texas policy that limits punishment to the party who committed the punishable act. As we did in *Aguirre*, we refer to *Western Resources Life Insurance Co. v. Gerhardt*.[34] To "the extent a policy may be gleaned from *Gerhardt*, that policy turns on the corporate history of the corporate successor".[35] *Gerhardt* states that in the case of *merging* corporations, the successor corporation assumes liability for exemplary damages. Lack of evidence of Celotex's corporate history makes it "impossible to determine whether that policy relieves Celotex of punitive liability".[36] Celotex's challenge fails.

**C. Punitive damages** necessarily raise questions concerning the eighth and fourteenth amendments of the United States Constitution[37] and the corresponding provisions of the Texas Constitution.[38] Celotex does not assert that the punitive damage award in this case is excessive. Rather, Celotex maintains that the punitive damages in this case, when considered with punitive damages awarded in previous, pending, and future cases, constitute excessive, multiple punishment, violative of the due process clauses as well as the excessive fines clauses of both the United States and Texas Constitutions.

■ (1) In this diversity case we look to the law of Texas. The Texas Constitutional prohibition of excessive fines applies to civil penalties.[39] In Texas, "[a] fine is not unconstitutionally excessive and the courts will not override the legislature's discretion, 'except in extraordinary cases, where it becomes so manifestly violative of the constitutional inhibition as to shock the sense of mankind' ".[40]

■ In tort suits, each jury determines the total amount of damages necessary to punish the defendant and to deter similar conduct. In asbestos litigation, there are thousands of cases against the same group of defendants. Celotex argues that if punitive damages are based on egregious conduct, defendants have been punished thousands of times for the same course of conduct; Celotex has been punished enough. If punitive damages are to deter misconduct, they have exhausted their deterrent effect.

**32.** 901 F.2d 1256 (5th Cir.1990).

**33.** *Id.* at 1258.

**34.** 553 S.W.2d 783, 787 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.). As noted in *Aguirre*, portions of this opinion, on which we do not rely, were overruled by legislation.

**35.** *Aguirre*, 901 F.2d at 1258.

**36.** *Id.*

**37.** In pertinent part, the 14th Amendment, Section 1 provides: "nor shall any state deprive any person of life, liberty, or property without due process of law". The 8th Amendment provides: "Excessive bail shall not be required, nor exces-

sive fines imposed, nor cruel and unusual punishments prohibited."

**38.** Tex. Const. art. I, § 19: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. 1, § 13 provides: Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.

**39.** *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex.1980), quoting *State v. Laredo Ice Co.*, 96 Tex. 461, 73 S.W. 951, 953 (1903).

**40.** *Id.*

Celotex fails to address the manner in which Texas juries assess punitive damages. Texas law provides that "[e]xemplary damages must be reasonably proportioned to actual damages."[41] Juries calculate compensatory damages case by case. Thus, even though Celotex has paid punitive damages to other plaintiffs in other cases, the punitive damages awarded in those cases have reflected the harm inflicted upon only the plaintiffs in those suits. In the instant case, with respect to each plaintiff, the jury responded affirmatively to an interrogatory asking whether Celotex acted "willfully, intentionally, or with callous or reckless and heedless disregard and indifference to the rights and welfare" of the plaintiff. That affirmative response led the jurors to the next interrogatory, answered separately for each plaintiff: "What sum of money, if any, do you assess as punitive damages for [each plaintiff] against the Celotex Corporation?"[42] The jury here has not attempted to impose punitive damages that disproportionately reflected the harm Celotex has inflicted on the plaintiffs in this case. On this record this Court cannot hold that Celotex has been punished repetitively and so excessively "as to shock the sense of mankind" in violation of the Texas Constitution. Here the jury's award of punitive damages was specifically targeted to Celotex's conduct as it affected each plaintiff.

 (2) In this appeal Celotex does not and cannot rely on the eighth amendment proscribing the imposition of "excessive fines" and "cruel and unusual punishments". Nevertheless, a brief discussion of some of the leading cases on the subject is pertinent because of the relevance of excessive fines (punitive damages) to due process. In *Ingraham v. Wright*,[43] Justice Powell, for the Court stated the accepted rule applicable to eighth amendment contentions: The eighth amendment "was designed to protect those convicted of crimes. We adhere to this longstanding limitation". In *Palmer v. A.H. Robins Co.*, the Supreme Court of Colorado relied on *Ingraham* in rejecting the applicability of the eighth amendment to punitive damages assessed against a mass tort defendant, the manufacturer of Dalkon shields.[44] In *Kelco Disposal Co., Inc. v. Browning–Ferris*, the Court of Appeals for the Second Circuit upheld a jury award of $6 million dollars in a case where the jury awarded compensatory damage of only $51,146.[45] The Supreme Court did not decide the issue of whether the award was excessive under the due process clause because that point had not been raised in either the district court or the court of appeals, nor was the award excessive under a federal common law analysis. In the Supreme Court, Justice Blackmun speaking for the Court, considered the Amercement Clause of Magna Carta, the English Bill of Rights, the intention of the Framers of our Constitution, the language of the Excessive Fines Clause, and the nature of our constitutional framework. He stated firmly:

> This Court has never held, or even intimated, that the Eighth Amendment serves as a check on the power of a jury to award damages in a civil case. Rather, our concerns in applying the Eighth Amendment have been with criminal process, and with direct actions by government to inflict punishment. Awards of punitive damages do not implicate these concerns.[46]

Justice O'Connor, in whose opinion Justice Stevens joined, also examined the historical record. She concluded that the Court's recitation of the history of the Excessive Fines Clause was not complete;

---

**41.** *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). *See also Wright v. Gifford–Hill & Co.*, 725 S.W.2d 712, 714 (Tex.1987) and *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1377 (5th Cir.1982).

**42.** Interrogatories Nos. 17 & 18.

**43.** 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977).

**44.** 684 P.2d 187 (Colo.1984).

**45.** 845 F.2d 404 (2d Cir.1988), *aff'd,* —— U.S. ——, 109 S.Ct. 2909, 2912, 106 L.Ed.2d 219 (1989).

**46.** —— U.S. ——, 109 S.Ct. 2909, 2912, 106 L.Ed.2d 219 (1989).

that in current usage a "fine" comprehends a "forfeiture or penalty recoverable in a civil action"; that punitive damages should be proportional to the offense. Justice O'Connor cited a number of recent articles supporting her position.[47]

No justice took the view that federal common law provides a basis for disturbing the jury's punitive-damage award.

It must be said that a strong arguable basis exists for applying the due process clause of the United States and Texas Constitutions to a jury's award of punitive damages in a mass tort context. In *Browning–Ferris* Justice Blackmun observed that the parties agreed that due process "imposes some limits on jury awards of punitive damages", but the Court has never addressed the question "whether due process acts as a check on undue jury discretion to award punitive damages in the absence of any express statutory limit".[48] The answer "awaits another day". Justices Brennan and Marshall joined in the Court's opinion "on the understanding that it leaves the door open for a holding that the Due Process Clause

constrains the imposition of punitive damages in civil cases brought by private parties".[49] Justice O'Connor, joined by Justice Stevens, concluded that the Excessive Fines Clause applied to the States through the Due Process Clause of the Fourteenth Amendment.[50] Justice O'Connor would have remanded the case to the Court of Appeals so that it in the first instance would apply "the Solem framework … and determine whether the award of over $6 million imposed on [Browning Ferris] violates the Excessive Fines Clause".[51]

In *Bankers Life and Casualty v. Crenshaw*,[52] Justice O'Connor in a concurring opinion was the first to highlight the due process argument in the context of punitive damages:

> Appellant has touched on a due process issue that I think is worthy of the Court's attention in an appropriate case. Mississippi law gives juries discretion to award any amount of punitive damages in any tort case in which a defendant acts with a certain mental state. In my view, because of the punitive character

---

**47.** Boston, Punitive Damages and the Eighth Amendment: Application of the Excessive Fines Clause, 5 Cooley L.Rev. 667 (1988); Massey, The Excessive Fines Clause and Punitive Damages: Lessons from History, 40 Vand.L.Rev. 1233 (1987); Jeffries, A Comment on the Constitutionality of Punitive Damages, 72 Va.L.Rev. 139 (1986); Note, The Constitutionality of Punitive Damages Under the Excessive Fines Clause of the Eighth Amendment, 85 Mich.L.Rev. 1699 (1987). *But see* Note, Constitutional Defenses Against Punitive Damages: Down But Not Out, 65 Ind.L.J. 141 (1989). The note opens with this statement: "The United States Supreme Court this past term dealt a staggering blow to civil litigants wishing to attack awards of punitive damages on constitutional grounds". But the last paragraph reads: "The better challenge to punitive damages has always been the due process clause. It stands on more solid ground substantively, and it provides a better solution to the problems facing business and industry. With a majority of the Court waiting to hear this argument, constitutional challenges to punitive damages have not been set back by *Browning–Ferris*. Instead, the proper arrow may be drawn from the constitutional quiver for an attack that appears stronger than ever." *Id.* at 165.

**48.** 492 U.S. at ——, 109 S.Ct. at 2921.

**49.** 492 U.S. at ——, 109 S.Ct. at 2923.

**50.** 492 U.S. at ——, 109 S.Ct. at 2925.

**51.** The Court has adopted a proportionality framework under the Cruel and Unusual Punishment Clause. *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). "I would adapt the Solem framework to punitive damages in the following manner. First, the reviewing court must accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue. Second, the court should examine the gravity of the defendant's conduct and the harshness of the award of punitive damages. Third, because punitive damages are penal in nature, the court should compare the civil and criminal penalties imposed in the same jurisdiction for different types of conduct, and the civil and criminal penalties imposed by different jurisdictions for the same or similar conduct. In identifying the relevant civil penalties, the court should consider not only the amount of awards of punitive damages but also statutory civil sanctions. In identifying the relevant criminal penalties, the court should consider not only the possible monetary sanctions, but also any possible prison term." *Browning–Ferris,* 492 U.S. at ——, 109 S.Ct. at 2934.

**52.** 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).

of such awards, there is reason to think this may violate the Due Process Clause.[53]

Justice Scalia concurred in Justice O'Connor's opinion.

The distinctive argument the appellant makes in this case does not relate to the components of *procedural* due process or even to the amount of the punitive damages the jury awarded in this case. Instead the appellant argues that punitive damages are so inappropriate in mass tort litigation, because now they are irrelevant to the policy reasons for punitive damages, that they constitute a violation of due process.

This Court carefully considered that argument on three occasions in *Jackson v. Johns–Manville Sales Corp.*[54] The defendant's argument in those cases, however, was not couched in terms of due process. In *Jackson I*, Chief Judge Clark, writing for a panel of this Court considered the "catastrophic nationwide exposure of workers to asbestos", "[t]he grave reality of the need to maintain viable enterprises to meet future compensation liability", the nature of strict liability in Mississippi, the Mississippi law of punitive damages requiring "a showing of wanton, gross, or intentionally wrongful conduct", and concluded that under Mississippi law punitive damages were inappropriate in asbestos litigation. In *Jackson II*, on in banc rehearing, Judge Randall for a majority of nine members of the Court, held that the case was "not an appropriate one for the creation of a federal common law because of the absence of a uniquely federal interest and the practical problems that would attend the displacement of state law".[55] The Court certified to the Mississippi Supreme Court three questions, one of which was:

whether a Plaintiff whose cause of action is based upon strict liability in tort can recover punitive damages against Defendants who have been or may be subjected to multiple awards of compensatory and punitive damages for the same wrongful conduct.[56]

Chief Judge Clark wrote a strong dissent making essentially the same arguments the appellants make in this case.[57] Judge Clark went into considerable detail in describing the dimensions of asbestos litigation. "By 1981, only eight years after *Borel v. Fibreboard Paper Products Corp.*,[58] it had far surpassed the number of cases generated by the controversies over Agent Orange, the drug DES, the Dalkon Shield intrauterine device, or even automobile defects".[59] The Mississippi Supreme Court declined certification without discussion.

In *Jackson III*, the Court grasped the nettle, holding that Mississippi law permits punitive damages in product liability matters including "mass tort cases". Again, the "focus of the defendants' argument is that the policies justifying punitive damages in Mississippi are not implicated in the mass tort case" and are "unavailable as a matter of law".[60] (Similarly, in this case the defendant focused its arguments on the policies applicable to awarding punitive damages in a mass tort case.) In the absence of any controlling authority in Mississippi law, the Court looked to the law of other states, concluding that "no appellate court has accepted the defendants' theory in a reported decision".[61] The Court cited the scholarly writing in print at the time, 1986.[62] Judge Randall, for the Court, pointed to the inconsistency in a defendant's contending that "in the *most* extreme cases, when a defendant commits an especially pernicious act which injures a

---

**53.** *Id.* at 87, 108 S.Ct. at 1655.

**54.** 727 F.2d 506 (5th Cir.1984) (*Jackson I*); 750 F.2d 1314 (5th Cir.1985) (*Jackson II*); 781 F.2d 394 (5th Cir.1986) (*Jackson III*).

**55.** 750 F.2d at 1327.

**56.** 781 F.2d at 396.

**57.** 750 F.2d at 1329.

**58.** 493 F.2d 1076 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

**59.** 750 F.2d at 1336.

**60.** 781 F.2d at 403.

**61.** 781 F.2d at 405.

**62.** 781 F.2d at 406.

myriad of innocent persons, cases which one might imagine to be especially suitable for the imposition of punitive damages, the law should shield the defendant from punitive damages by the sheer magnitude of its wrong".[63] The Court was strongly of the view, as also stated in *Jackson II*, that "Congress' silence in the face of a desperate need for federal legislation in the field of asbestos litigation does not authorize the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions".[64] Chief Judge Clark again dissented, this time suggesting that the Court should have certified the issues, which are a national problem, to the United States Supreme Court; "the problems we face in this litigation are ones of national policy".[65]

In this case, the appellant picks up where Chief Judge Clark left off in the *Jackson* cases, at least in relying on the expansion of the asbestos litigation and the difficulties inherent in allowing multiple punitive damages in mass tort actions. The number of asbestos cases pending against Celotex as of August 31, 1988, according to the appellant's brief, was 65,000 as against filings of 24,000 at the time of *Jackson II;* the rate of new filings against Celotex has more than tripled to 1,600 a month. These figures are in addition to 27,000 cases which Celotex had disposed of, largely by settlement, at a cost of $250,000,000, a figure, according to the appellant, almost twice Celotex's net worth of $149,000,000.

Unfortunately, no legislative solution exists for the problem of determining punitive damages in the context of mass tort litigation. The United States Supreme Court has held that the Excessive Fines Clause of the Eighth Amendment is inapplicable in civil actions, but has left the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private persons. We have held that in this case, award of punitive damages did not violate the Excessive Fines Clause of the Texas Constitution. With some misgivings, the panel holds that it is bound by the *Jackson II and III* cases: The same arguments that are made here for violation of due process on substantive policy grounds were made in *Jackson I, II, and III* for the inappropriateness of punitive damages in mass tort litigation. We have misgivings, however, because we are acutely conscious of the prophetic words Judge Henry Friendly used twenty-three years ago: "The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering.... We have the greatest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill."[66]

The judgment of the district court is AFFIRMED.

---

63. 781 F.2d at 407.

64. 781 F.2d at 415.

65. 781 F.2d at 417.

66. *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832, 839 (2d Cir.1967).