**FIBREBOARD CORPORATION,
et al., Appellants,**

v.

**Reuben S. POOL and Lee
Pool, et al., Appellees.**

**FIBREBOARD CORPORATION,
et al., Appellants,**

v.

**Lessie L. WILLIAMS, et al., Appellees.**

**Nos. 6–90–014–CV, 6–90–022–CV.**

Court of Appeals of Texas,
Texarkana.

July 16, 1991.

Second Rehearing Overruled
Aug. 28, 1991.

Edward J. Burke, Brobeck, Phleger & Harrison, San Francisco, Cal., David L. Tolin, Weller, Wheelus & Green, Beaumont, Tex., for Fibreboard.

Donald J. Verplancken, Butler & Binion, Kevin S. Risley, Houston, Tex., for Celotex Corp.

Joe R. Greenhill, Baker & Botts, Austin, Tex., Larry D. Carlson, Baker & Botts, Dallas, Tex., for Owens–Illinois.

James H. Harris, Jr., Holmes & Harris, Beaumont, Tex., for the Flintkote Co.

A.B. Conant, Jr., David M. Pruessner, Dallas, Tex., for Garlock.

Paul L. Sadler, Rex Houston, Henderson, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

This is an appeal from a judgment entered against six defendants in a products liability case in which five plaintiffs suffered asbestos-related injuries resulting from their exposure to various products manufactured by the defendants. The basis of the lawsuit was strict liability for

failure to warn of the risks of exposure to asbestos. Of the five personal injury claims, two were lung cancer death claims (George Williams and Donald Freeman). The other three claims included a confirmed asbestosis case (Charles Strong), a disputed asbestosis case (Thomas Sledge), and a case in which the plaintiff had asbestos-related pleural disease (Reuben Pool). The jury awarded compensatory damages of $5,087,000, and punitive damages totalling $5,000,000.

The two above-styled and numbered cases were consolidated for trial under cause numbers 86–363 and 88–08–293. The cases were also consolidated for appeal to this Court.

The five appellants in this case filed separate briefs setting out thirty-eight different points of error. Appellant Fibreboard has eight points of error in its brief and adopts twenty-three points of error from appellant Owens–Illinois, twenty-two points of error from appellant Celotex, and two points of error from appellant Garlock. The adoption of points in multi-party appeals should be encouraged to conserve words, paper, and the eyesight of the members of the judiciary. Owens–Illinois sets out twenty-three points of error in its brief. Appellant Flintkote's brief has eleven points of error; Garlock's brief contains ten points of error; and Celotex sets out twenty-two points of error in its brief. We have combined the points into the following thirty-five issues for the purpose of discussion:

(1) whether the trial court properly admitted into evidence the "Sumner Simpson papers";

(2) whether the trial court properly refused to give appellants' requested limiting instruction in regard to the Sumner Simpson papers;

(3) whether the trial court abused its discretion in admitting autopsy photographs of Donald Freeman;

(4) whether the trial court submitted a proper damage question to the jury in regard to appellees Strong, Sledge, and Pool;

(5) whether the trial court properly refused the appellants' tendered instruction to limit compensatory damages for conditions resulting from exposure to asbestos-containing products;

(6) whether the trial court properly submitted Question No. 17 which included "loss of enjoyment of life" as an element of damages;

(7) whether the cancer instruction concerning appellees Strong, Sledge, and Pool caused the jury to compensate them for future cancer not caused by asbestos exposure;

(8) whether the trial court properly admitted a color poster prepared by the Oil, Chemical and Atomic Workers International Union;

(9) whether the trial court properly admitted deposition testimony of witnesses Virgil M. Evans and James Henry Read in which appellants' cross-examination was limited to five written questions;

(10) whether the trial court properly excluded evidence of military specifications requiring the use of asbestos in insulation products;

(11) whether the trial court properly excluded a portion of the deposition testimony of Dr. Corwin Hinshaw, the appellants' state-of-the-art expert on asbestos;

(12) whether the trial court properly denied appellants' motion for directed verdict on limitations against appellee Strong;

(13) whether the trial court properly entered judgment based on the jury findings in favor of appellee Strong that he did not know nor should he have known more than two years before filing suit that he had developed an asbestos-related disease;

(14) whether the trial court properly entered judgment based upon the jury's finding in favor of appellee Pool for future medical expenses;

(15) whether sufficient evidence existed for the trial court to render judgment in favor of appellee Pool based upon the jury's finding of $100,000 in damages;

(16) whether the trial court abused its discretion in permitting Donna Freeman

and Ollie Freeman to file answers to Garlock's request for admissions;

(17) whether there was any evidence or sufficient evidence to support the jury award to Ollie Freeman for $30,000 in damages;

(18) whether any evidence existed to support the trial court's judgment in favor of the Williams children based upon the jury's finding of $25,000 in damages for pecuniary loss and $25,000 in damages for termination of the parent-child relationship;

(19) whether sufficient evidence was presented for the trial court to render judgment in favor of the Williams children;

(20) whether sufficient evidence existed for the trial court to render judgment against appellant Owens–Illinois based upon the jury's finding that the appellant caused twenty-five percent of appellees' asbestos-related injuries;

(21) whether the awarding of punitive damages violates the due process clause of the United States Constitution or the Texas Constitution and the excessive fines provision of the Texas Constitution and the common law of Texas;

(22) whether any or sufficient evidence existed to show that appellant Garlock's products were defective, unreasonably dangerous and contributed to appellees' injuries;

(23) whether sufficient evidence existed to support the jury verdict in respect to appellant Flintkote;

(24) whether sufficient evidence was present to support jury findings of punitive damages against appellants Garlock, Flintkote and Fibreboard;

(25) whether the trial court acted within its discretion under TEX.R.CIV.P. 265 when it refused to allow appellant Flintkote to make its opening statement to the jury at the beginning of its case-in-chief;

(26) whether the trial court properly submitted to the jury questions concerning liability and comparative causation;

(27) whether the jury's answer to Question No. 8 (finding the companies that supplied asbestos-containing products which were the producing cause of appellees' injuries) was against the great weight and preponderance of the evidence;

(28) whether the jury's answer to Question No. 16 apportioning fault was against the great weight and preponderance of the evidence;

(29) whether the trial court properly admitted into evidence the depositions of William Simpson, Kenneth Wallace Smith, Barry Castleman, Thomas Mancuso, Arthur Mueller and Richard Gaze;

(30) whether the trial court abused its discretion in failing to give a limiting instruction on the above depositions regarding appellant Garlock;

(31) whether the trial court properly submitted jury questions which allowed the jury to award punitive damages and whether the questions commented on the weight of the evidence;

(32) whether the trial court properly submitted Question No. 20 in the verdicts of Pool, Sledge, and Strong which asked for the assessment of punitive damages "for the injuries of" each plaintiff and whether this resulted in a double recovery for compensatory damages;

(33) whether the trial court properly excluded a letter offered by Celotex to prove that it had done everything possible to reduce the hazards of asbestos exposure;

(34) whether the trial court properly excluded evidence concerning exposure to the products of Johns–Manville and other companies which were under the direction of bankruptcy courts;

(35) whether the trial court created a cumulative effect of errors in the trial to deprive appellants of their rights to a fair trial and due process of law.

## NATURE OF THE CASE

Between the 1950's and the present, appellees worked as insulators or maintenance mechanics performing insulation repair work at Texas Eastman in Longview, Texas, and at other companies. During their employment at Texas Eastman, appellees handled numerous products that contained asbestos. The appellants supplied

asbestos products to Texas Eastman: Fibreboard, Owens–Illinois, and Celotex supplied asbestos insulation; Flintkote supplied liquid asbestos products used to cover the insulation; and Garlock supplied gaskets and valve packing. The evidence showed that the appellees used products manufactured by all of the appellants, except that there was no evidence that Williams used any of Garlock's products.

The evidence further showed that the dangers associated with exposure to asbestos were well known by the late 1940's. The appellees, however, were not warned of these dangers. Although some of the appellants stated that a caution label was placed on their boxes in the mid–1960's to 1970's, the evidence showed that neither the purchasing agent at Texas Eastman nor any of the appellees saw the warnings.

## THE SUMNER SIMPSON PAPERS

■ The appellants contend that the trial court erred in admitting into evidence what is generally referred to as the Sumner Simpson papers and that the trial court further erred in refusing to give their requested limiting instructions in regard to the papers. The Sumner Simpson papers include about 6,000 documents, but only seven letters were offered into evidence by the appellees. These letters are a collection of correspondence from the 1930's and 1940's among the following three people: Sumner Simpson, former President and Chairman of the Board of Raybestos–Manhattan; Vandiver Brown, an in-house attorney for Johns–Manville; and A.S. Rossiter, editor of *Asbestos Magazine*. The letters show knowledge about the hazards of asbestos during the 1930's and 1940's.

At trial, appellants objected to the admission of the Sumner Simpson papers on the basis that they were hearsay, that the documents were not properly authenticated and therefore not admissible under TEX. R.CIV.EVID. 901, that they were irrelevant under TEX.R.CIV.EVID. 401 and 402, that their prejudicial effect outweighed their limited probative value, that their effect amounted to cumulative prejudice and caused confusion, that the issue for which

the proof was offered was uncontested (i.e., that asbestos caused asbestosis in the 1930's), that they were not probative as to the liability of manufacturers who manufactured a totally different kind of product, and that it was evidence that concerned bankrupt companies (Johns–Manville and Raybestos–Manhattan). The trial court sustained an objection to summaries of this material.

On appeal, appellants brought forward these complaints and also specifically contended that the material in the letters was irrelevant because Johns–Manville and Raybestos–Manhattan, which were involved in the correspondence, were not parties to this case. Appellants further contend that the letters were irrelevant because the parties to this case were not recipients of the letters, and because there was no showing that the appellants were aware of the letters.

■ In a failure-to-warn case, the plaintiffs are required to establish that the dangers were reasonably foreseeable or scientifically discoverable at the time of the exposure before a defendant can be found liable. *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). All manufacturers are held to the knowledge and skill of an expert. *Borel*, 493 F.2d at 1089.

The appellants contend that the Texas Supreme Court in *Gaulding v. Celotex Corp.*, 772 S.W.2d 66 (Tex.1989), rejected the holding in *Borel*. In the *Borel* case, it was uncontroverted that the plaintiff was injured from inhaling asbestos dust and that he was in fact exposed to the products of all of the defendants. In the *Gaulding* case, the court found that the evidence did not establish who manufactured the board that contained asbestos. The Texas Supreme Court did not reject the holding in *Borel* but distinguished it from *Gaulding*.

If the dangers of asbestos were known at the time of the exposure, then the same risks were scientifically discoverable by other asbestos corporations. *Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir. 1985); *Jackson v. Johns–Manville Sales*

*Corp.*, 750 F.2d 1314, 1317 (5th Cir.1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). The fact that Raybestos–Manhattan and Johns–Manville are not parties to this case does not make these letters inadmissible to show that the dangers of asbestos were known during that earlier time period. *See King v. Armstrong World Industries*, 906 F.2d 1022, 1025 (5th Cir.1990). Furthermore, appellees were not required to show that appellants were aware of the letters or were recipients of the letters to show that the dangers of asbestos were known in the industry at that time.

In the case of *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), the appellate court was reviewing the case in which the trial court had excluded the offer of some of the Sumner Simpson papers. The court concluded that the trial judge did not err in excluding these documents because what the asbestos manufacturers knew and when they knew it was presented in great detail by experts, which made the evidence presented by the Sumner Simpson papers a repetition of the other evidence. In *Jackson*, 750 F.2d at 1318, the court, sitting *en banc*, held the Sumner Simpson papers admissible to show what asbestos manufacturers other than Johns–Manville knew or should have known about the dangers of inhaling asbestos fibers.

■ Flintkote also contends that the letters cannot be relevant to it because the companies involved in the letter writing did not make liquid products containing asbestos. Flintkote's duty as a manufacturer was not limited to obtaining only the knowledge in some narrowly specialized field, but extended, at a minimum, to keeping abreast of scientific knowledge, discoveries and advances. *Borel*, 493 F.2d 1076. The Sumner Simpson letters pertained to the dangers of asbestos fibers generally when inhaled into the lungs and would be admissible against Flintkote in conjunction with other evidence that showed that the asbestos fibers from its product could be inhaled into the lungs.

■ Some of the Sumner Simpson papers have been admitted in several federal cases to show what asbestos manufacturers, other than Johns–Manville, knew or should have known about the dangers of inhaling asbestos fibers. *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129 (5th Cir.1985); *Jackson*, 750 F.2d 1314. In the case of *Jackson*, the court found that this evidence showed the likelihood of the foreseeability of the dangers of asbestos products. The appellate court said that the slight danger that the admission of such evidence would have caused sufficient unfair prejudice to warrant exclusion was properly ignored by the trial court. While the portion of letters dealing with the proposed cover-up should have been deleted, we do not find that the unfair prejudice outweighs the overall probative value of these papers.

■ The Simpson deposition properly authenticates these letters, and they are admissible as exceptions to the hearsay rule under the business records exception, TEX. R.CIV.EVID. 803(6), as well as the ancient document exception, TEX.R.CIV.EVID. 803(16).

Appellees contend that they had an agreement with appellants that they could introduce Simpson's deposition without being required to show his unavailability. We find no such agreement in the record. The hearsay objection at trial points only to the letters which were Exhibits 465–A, 465–B, 465–C, 465–D, 465–E, 465–F and 465–J. However, the only objections made at trial to Simpson's deposition[1] were that it was highly prejudicial and was not relevant to the issue of liability of the companies that did not make insulation. The deposition lays the predicate for the introduction of the letters and thus it was necessary for the introduction of evidence concerning the dangers of asbestos fibers, regardless of the source, when inhaled into the lungs. This is relevant to all parties in

---

1. The record reflects that a hearsay objection was made to Exhibit 465. According to the record, Plaintiff's Exhibit 465 was a summary of a deposition, and the trial court sustained that objection.

this cause of action. The points of error concerning the introduction of the Simpson deposition and Sumner Simpson papers are overruled.

■ Appellants also complain about the failure of the trial court to give a limiting instruction at the time the Sumner Simpson exhibits were offered into evidence and in the charge submitted to the jury. When the exhibits were introduced, appellants requested that the trial court give this limiting instruction to the jury: "This evidence is not to be considered for the purpose of determining the actual knowledge or state of mind of any Defendant." This requested instruction was overly broad because it would have prevented the jurors from inferring that any of the appellants had actual knowledge of the dangers of asbestos. This would negate the presumption that manufacturers are experts who have the same knowledge that other manufacturers in that industry have.

In the case of *King v. Armstrong World Industries*, 906 F.2d 1022, the trial court gave the following limiting instruction: "You are instructed that the deposition testimony of William S. Simpson ... and Richard Gaze is offered for the limited purpose of showing, if it does, what the industry knew or could have discovered by testing their products." This type of instruction would have allowed the jurors to infer that the defendants in that case had the same knowledge as the industry generally.

■ Appellants requested that two instructions concerning the use of the Sumner Simpson papers be placed in the jury charge:

Proposed jury instruction (punitive damage).

Certain evidence received during the course of trial relates to actual knowledge of particular companies, some of which are not parties to this lawsuit. Such evidence includes the Eagle Pincher documents; the Sumner Simpson papers; the Saranac Laboratory documents, and the deposition testimony of William Simpson, Kenneth Smith, Art Mueller, Dr. Frank Mancusso (sic) and Dr. Richard Gaze. You may not consider such

evidence to establish willfulness or callous disregard on the part of any Defendant that did not have actual knowledge of such evidence.

Proposed jury instruction (punitive damage).

Certain evidence received during the course of trial relates to actual knowledge of particular companies, some of which are not parties to this lawsuit. Such evidence includes the Eagle Pitcher (sic) documents; the Sumner Simpson papers; the Saranac Laboratory documents; and the deposition testimony of William Simpson, Kenneth Smith, Art Mueller, Dr. Frank Mancusso (sic) and Dr. Richard Gaze. You may not consider such evidence to establish willfulness, intent, or callous or reckless or heedless disregard, or indifference on the part of any Defendant that did not have actual knowledge of such evidence.

■ These instructions would have been proper in regard to the Sumner Simpson papers; however, the trial court has considerably more discretion in submitting instructions and definitions than in submitting questions. *Harris v. Harris*, 765 S.W.2d 798 (Tex.App.—Houston [14th Dist.] 1989, writ denied); *First State Bank & Trust Co. of Edinburg v. George*, 519 S.W.2d 198, 207 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). The jury was capable of realizing that any manufacturer or seller that did not have actual knowledge of the dangers of asbestosis could not be said to have acted willfully or intentionally in failing to provide an appropriate warning. If the manufacturer or seller did not have knowledge of the dangers of asbestos, the jury then had to determine if they were reckless or indifferent because they could have obtained the information and chose not to do so.

The Sumner Simpson papers should not have been used to show that the appellants in this case were involved in a cover-up to prevent the public from having knowledge about the actual dangers of asbestosis. The showing that other companies mentioned in these papers were guilty of such acts in no way demonstrates that these

appellants were involved in such conduct. The appellees attempt to justify the drawing of such an inference based upon language in one of the letters referring to the "industry, mostly working as a unit." However, this reference in the letter simply refers to the making of a systematic dust investigation and further states that these investigations are generally paid for by "industry, mostly working as a unit." It does not refer to an industry-wide cover-up of the dangers of asbestos.

■ Appellants point out that the appellees made unjustified implications when their attorney in his summation referred to the cover-up discussed in the Sumner Simpson letters and told the jury, "See how it affects you, because you are going to be asked about punitive and exemplary damages that I'm going to talk about in a little bit." This argument, however, was not objected to at trial, and it is only mentioned on appeal in conjunction with the argument about the inadmissibility of the Sumner Simpson papers. Thus, any error concerning the summation was not preserved and has not been brought forward on appeal. The jury was aware from the evidence that the persons discussing the cover-up of the dangers of asbestos were not parties or employees of parties to this suit. We find that the trial court's failure to give an instruction was not an abuse of discretion. These points of error are overruled.

## ADMISSIBILITY OF PHOTOGRAPHS

■ Appellants next contend that the trial court abused its discretion in admitting the autopsy photographs of Donald Freeman. They contend that the admission of these photographs constituted reversible error because they were not relevant to any disputed fact. To be admissible, photographs must illustrate disputed fact issues and must portray facts relevant to an issue. *Heddin v. Delhi Gas Pipeline Co.*, 522 S.W.2d 886, 889–90 (Tex.1975). Appellants objected to the admission of these photographs at every stage of the proceeding. Before trial, they filed a motion to exclude photographs and videotapes, which the trial court denied. At trial, they object-

ed to the admission of the photographs on the ground that they did not show anything that was in dispute; and alternatively, that because of the gruesome nature of the pictures, any probative value was far outweighed by the danger of unfair prejudice. In addition, they moved twice for a mistrial, partially because the photographs were admitted into evidence.

■ The general rule is that pictures or photographs that are relevant to any issue in the case are admissible. *Texas Employers Ins. Ass'n v. Agan*, 252 S.W.2d 743 (Tex.Civ.App.—Eastland 1952, writ ref'd). When a photograph is a proper representation of an important fact issue, the admission or rejection of it is a matter which rests largely within the discretion of the trial judge, and that decision will not be disturbed on appeal unless an abuse of discretion is shown. *Richardson v. Missouri–K.–T.R. Co. of Texas*, 205 S.W.2d 819, 824 (Tex.Civ.App.—Fort Worth 1947, writ dism'd). Relevant evidence will not be excluded simply on the ground that it would create prejudice if permitted. *Sherwin–Williams Co. v. Perry Co.*, 424 S.W.2d 940 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.). The fact that the photographs are gruesome does not render them inadmissible. *Texas Employers Ins. Ass'n v. Crow*, 218 S.W.2d 230 (Tex.Civ.App.—Eastland 1949), *aff'd*, 148 Tex. 113, 221 S.W.2d 235 (1949). Therefore, the question in the present case is whether the pictures were relevant and otherwise admissible.

At trial, appellants took the position that cigarette smoking, not asbestosis, caused Freeman to die of lung cancer. Thus, the appellees contend that the photographs were used to explain and demonstrate the involvement of asbestos in Freeman's death.

Dr. V.V. Gonzales, who performed the autopsy, testified that asbestos fibers could be seen only with a microscope and that there were no asbestos bodies in the lungs of Freeman. He testified that the asbestos fibers may disintegrate or fragment so that they cannot be found, but the effect of the toxic material liberated by those fibers can be found. He further testified that when

the cancer is caused by smoking alone, there will not be scarring in the lungs, but when asbestos is involved there will be a grey-white scar tissue called hyaline plaques. He told the jury that in Freeman this tissue was discovered throughout the chest cavity, the covering of the heart and the diaphragm. According to Dr. Gonzales' testimony, Freeman's right lung was replaced by a tumor, especially in the upper half of the lung and that it extended to the middle part of the lung and encircled the major blood vessel in the back part of the lung. The tumor had also encased the esophagus, replaced almost one half of the right thoracic cavity, and invaded the adrenal glands below the diaphragm and a part of the kidney.

Dr. Gonzales pointed out to the jury the scarring or the hyaline material in the pictures taken during the autopsy:

Exhibits 618–D, 618–E, 618–F: "... this is the so-called hyaline plaques.... The hyaline plaques that I mentioned is these grey-white spots and there's one that's nodular. This has covered the cavity, the pleural cavity, and also the diaphragm and also the covering of the heart."

Exhibit 618–G: "This is another of the right side of the lung, the grey-white plaques here, scarring, and if you replace the chest cavity, which is again it occupies a certain volume of the space that will result into the decrease in the pulmonary function of the lungs."

Exhibit 618–I: "I is another part of the hyaline plaques, nodules throughout that line part of the ribs and scar."

Exhibit 618–J: "J is another exposure that shows the hyaline plaques at a closer view.... These are the scars of the pleura covering the chest cavity."

Exhibit 618–K: "K is another area that showed the scarring, the hyaline material, the scar tissue.... This is associated with asbestos."

Exhibit 618–L: "L is part of the lung tissue that I show the grey-white here or the plaques."

Exhibit 618–O: "This is the grey-white hyaline plaques again that shows the covering of the heart is partly replaced by this grey-white plaque."

Exhibit 618–P: "P is the cross-section of the right lung which shows just like a sponge in which the normal lung tissue is gone, it's replaced by diffuse replacement of the lung tissue by scar tissue."

Exhibit 618–U: "... You can see the large spaces here which is called the bullae or the emphysematous bullae resulting from the scarring."

Exhibit 618–V: "V is another hyaline plaque. You can see this large one here."

Exhibit 618–W: "W is the entire lung after I removed the heart, the lung, and demonstrate the windpipe and cross-section of the tumor that has extended into above the backbone.... This is a close-up view of the plaque. There's a plaque here (indicating), there's a plaque here (indicating), this plaque, but again there is a nodule here that more or less formation of nodule. In addition to the plaque here in this nodule, there is some cancer in there. I make a cut and I think that is the point that I make a cut, but I removed that and cut to demonstrate that nodule."

Exhibit 618–Z: "Z is a plaque that I mentioned that has replaced the diaphragm. This is at the end of the forceps you can see the plaque, here."

Exhibit 618–BB: "This is another one of the thoracic surface or the surface of the diaphragm which indicates that there's a large plaque too."

Exhibits 618–DD, 618–EE: "This is the appearance of the adrenal glands. There are two glands on top of the kidney. The next side is here which is rather big, and when I cut it, you can see the white area, nodule, which is not normal in an adrenal gland, and these are—they spread resulting from the lung cancer."

Exhibit 618–HH: "This tumor has spread not only to the adrenal glands but this is one-half of the kidney, and you can see the nodule in that."

Exhibits 618–JJ, 618–KK, 618–LL: "Q Do any of these ... show any of the scarring?

A Yes, sir."

Exhibit 618–LL: "This is a cross-section of the right lung. This white area here is the tumor.... [t]his part of the lung has been replaced by scar tissue."

The testimony shows that all of the foregoing exhibits refer specifically to the scarring or hyaline plaques, which in turn goes directly to an issue in the case. Dr. Gonzales testified that other exhibits, including 618–M, 618–N, 618–R, and 618–T, were duplications of exhibits showing the scar tissue, sometimes showing an enlargement of an area. Four of the pictures to which Dr. Gonzales referred do not demonstrate the scarring or hyaline plaques. Exhibits 618–A, 618–B, and 618–C are pictures of Freeman's body which, according to Dr. Gonzales, showed that the fat on his body was completely gone at the time of his death as a result of having cancer. Exhibit 618–H shows a part of the inside of the lung, which was black. This exhibit would not appear to harm the appellants in their contention that Freeman's death was caused by smoking.

■ Appellants objected to the 618 series of pictures outside the presence of the jury on the basis that they were not relevant to any disputed fact and that they were prejudicial because of their gruesomeness. The counsel for the appellees stated at the hearing that he was not going to show all the photographs to the jury, "probably six or eight of them or ten at the outside." The court allowed a running objection on relevance and prejudice, but informed the attorneys for the appellants that he would permit them to reurge any objection on their (the photographs) being cumulative if there were any duplications at the time they were offered into evidence. Appellants' counsel apparently put all of the 618 series photographs into evidence, but no objection was made that the exhibits were cumulative or duplicative. Thus, any complaint on that basis was waived.

■ Overall these exhibits and the accompanying testimony are relevant to the issue of the cause of Freeman's death. The appellants argue that these photographs should not have been admitted because they did not dispute the presence of hyaline plaques and pleural thickening and because Dr. Gonzales gave testimony confirming the existence of hyaline plaques and pleural thickening, which was also corroborated by his autopsy report. The admissibility of evidence does not hinge on whether the opposing party is able to rebut the specific evidence, but on whether the evidence is relevant to a disputed issue in the case. Outside the presence of the jury, the appellants told the court that they did not dispute the fact that an autopsy was done, that hyaline plaques were present, and that pleural thickening was present. The appellants have not pointed out any place in the record that such an admission or stipulation was made in the presence of the jury. The appellants strongly disputed the element issue of causation and therefore the photographs were admissible to assist the expert in explaining and demonstrating why he believed that asbestos was the cause of Freeman's death. These points of error are overruled.

### JURY CHARGE

■ Appellants next contend that the trial court should have limited the damages questions of appellees Strong, Sledge, and Pool to asbestos-related injuries and that the trial court should have allowed appellants' tendered instruction to limit compensatory damages for conditions resulting from exposure to asbestos-containing products. When a plaintiff suffers a pre-existing injury that is closely connected to the injury caused by the defendant, the trial court should affirmatively charge the jury that the plaintiff can recover only for the extent of injuries caused or aggravated by the defendant's negligence. *Dallas Ry. & Terminal Co. v. Ector*, 131 Tex. 505, 116 S.W.2d 683 (Tex.Comm'n App.1938, opinion adopted). To determine whether an alleged error exists or is reversible, the Court should consider the pleadings, the evidence, and the charge in their entirety. *Island Recreational Development Corp. v. Re-*

*public of Texas Savings Ass'n.,* 710 S.W.2d 551, 555 (Tex.1986).

In the present case, Question No. 17 in each of the series of questions on Strong, Sledge, and Pool asked the jury to determine the sum of money that would fairly and reasonably compensate each appellee "for his injuries, if any, resulting from the occurrence in question." Question No. 18 in each series required the jury to determine the amount of money to compensate each of the spouses "for the injuries, if any, to her husband resulting from the occurrence in question." The appellants objected to the submission of these issues on the grounds that there was no evidence or insufficient evidence to determine the meaning of "occurrence in question" and requested that the instruction be limited to asbestos-related injuries.

Appellants cite *Littleton v. Woods,* 538 S.W.2d 800 (Tex.Civ.App.—Texarkana 1976), *aff'd,* 554 S.W.2d 662 (Tex.1977), in support of their contention. In *Littleton,* this Court held that the issue concerning damages for mental anguish suffered "as a result of the occurrence in question" was defective because it did not limit the jury to awarding damages for mental anguish caused by acts that the defendant produced or proximately caused. *Littleton,* 538 S.W.2d at 801–02. However, the *Littleton* case involved more than one theory of recovery.

The only theory of recovery in the present case was for damages resulting from appellants' failure to warn of dangers associated with exposure to asbestos. The charge in its entirety reflects this theory by requiring a finding of asbestos-related injury resulting from the failure to warn. Question No. 1 of the jury charge for each appellee asked, "Do you find that the [appellee] has sustained an asbestos-related injury?" The charge continues in Question No. 2 inquiring whether the appellee was exposed to asbestos-containing products to such an extent that the exposure was a producing cause of the injury. Question No. 5 inquired whether the appellants failed to adequately and timely warn of the dangers of injury. Questions No. 6 and 7

inquired if the failure to warn rendered the asbestos-containing products unreasonably dangerous as marketed and if such failure was a producing cause of the injuries and damages in question. Finally, Questions No. 17 and 18 asked what sum of money would fairly and reasonably compensate the appellee and his spouse for his injuries, if any, resulting from the occurrence in question.

Because the liability issues were submitted with the term *injury* and focused the jury's attention on asbestos-related injuries resulting from the failure to warn of the dangers of asbestos, the appellants' requested instruction to limit Questions No. 17 and 18 to asbestos-related injuries was not necessary. *See* 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 80.07 comment (1990). The wording of Questions No. 17 and 18 contains the appropriate damages issue generally used in personal injury cases. *See* 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 80.02B, 80.03B (1990). The language used in Questions Nos. 17 and 18 properly limited appellees' damages to asbestos-related injuries where the only recovery sought was for damages resulting from appellants' failure to warn of the dangers of asbestos. These points of error are overruled.

■ Appellants duly objected to the inclusion of "loss of capacity for enjoyment of life" in the charge and on appeal complain of the trial court's inclusion of this language. The amount awarded for "loss of capacity for enjoyment of life" was lumped together with pain and mental anguish.

The states divide on the issue of allowing loss of enjoyment of life in tort cases into those states that hold that loss of enjoyment of life is a factor in determining damages in general and those states that take the view that loss of enjoyment of life is a proper, separate element of damages. *See* Annot., 34 A.L.R.4th 293 (1984). Texas courts have taken the position that loss of enjoyment of life may not be claimed as a separate element of damages, but may be treated as a factor in determining damages in general or for pain and suffering. *Mis-*

*souri Pacific R. Co. v. Lane,* 720 S.W.2d 830 (Tex.App.—Texarkana 1986, no writ).

In the charge, the jury was asked to assess damages for "pain, mental anguish, *and* loss of capacity for enjoyment of life" (emphasis added). Appellants complain that the use of the conjunction *and* instructed the jury to award damages for the loss of enjoyment of life in addition to damages for pain and mental anguish. Appellees argue that this combined submission constitutes a single element.

In the case of *Dugas v. Kansas City Southern Railway Line,* 473 F.2d 821 (5th Cir.1973), the court was faced with a similar charge, and the court ruled that using the word *and* made it appear to the jury that "loss of enjoyment of life" and "loss of vitality" were separate and independent, rather than includable items of damages. And at the very least, they were couched in terms that would have confused the jury as to the correct standards. The court reversed the case, saying that the defendant was entitled to have a jury measure those damages according to a clear, legally correct, plainly enunciated standard. A significant difference in that case was the inclusion of the term "loss of vitality," and an instruction to the jury warning them not to duplicate the "plaintiff's physical impairment and loss of vitality." The court in the *Dugas* case did not instruct the jury concerning the possible duplication of loss of enjoyment of life with other elements. The jury was therefore left to infer that since it was instructed concerning one and not the other, that it was free to allow double recovery in regard to "loss of enjoyment of life."

In an early Texas case, the court held that evidence showing a loss of capacity for "enjoyment of pleasures of life" was too vague to furnish information on damages. *Locke v. International and GNR Co.,* 25 Tex.Civ.App. 145, 60 S.W. 314 (1901, no writ). Later Texas cases recognized this loss to be a factor in determining damages. *Lane,* 720 S.W.2d 830. The evidence allowed to show pain and suffering generally includes a showing of a diminishment of enjoyment of life and the loss of being able to function as a whole person. This element is not to be considered as a separate item because of the possibility of double compensation. Although the better wording would have specified its inclusion as a part of pain and mental anguish, the lumping of this factor together with pain and mental anguish was not likely to cause the jury to reach a double compensation for this element. These points of error are overruled.

 Appellants next complain that the trial court erred in its instruction in regard to possible future cancer in the damage question for Charles Strong.[2] Appellants argue that the cancer instruction allowed the jury to compensate for future cancer without regard to its cause and that the instruction is a comment on the weight of the evidence. The instruction must be read in context. The initial Question No. 17 to which it relates is as follows:

> From a preponderance of the evidence what sum of money, if any, if paid now in cash, do you find will fairly and reasonably compensate the plaintiff Charles Strong, for his injuries, if any, *resulting from the occurrence* in question.

(Emphasis added.) This language clearly ties everything under it to the occurrence in question. The last portion of the cancer instruction itself limits the mental anguish to that which he has suffered or will suffer from his reasonable fear of "cancer or mesothelioma he might suffer from his asbestos exposure." The only cancer evidence related to Strong concerned his expo-

---

**2.** The trial court gave the following instruction concerning the probability of cancer in the future: "In answering this question as to each future element of damage I instruct you that you may consider and compensate for in your answer cancer or mesothelioma which you find from a preponderance of the evidence he will suffer in the future in reasonable probability. If you do not find that he will in reasonable probability suffer a cancer or mesothelioma, you may consider and compensate the plaintiff for any mental anguish he has suffered or will suffer in the future from his reasonable fear, if any, of cancer and mesothelioma he might suffer from his asbestos exposure, distinct from any fear of cancer which all persons might have."

sure to asbestos and the only recovery sought and argued before the jury from the voir dire to the final summation was for asbestos-related injuries. When viewed in the context of the trial and the charge, the instruction is properly limited and does not constitute a comment on the weight of the evidence. These points of error are overruled.

## ADMISSIBILITY OF POSTER

The next contention is whether the trial court properly admitted a color poster prepared by the Oil, Chemical and Atomic Workers International Union. Appellants objected to the poster on the ground that it was inadmissible hearsay. The large color poster declares the hazards of asbestos and states that it is causing an "epidemic on the same scale as the bubonic plague which killed millions during the Middle Ages." It further states that even a few days of exposure to asbestos can be dangerous.

The face of the poster shows that it was written by Dr. Molly Coye. Dr. Joseph Wagner testified that Coye prepared the poster as a consultant to the Oil, Chemical and Atomic Workers International Union, which was then under contract with the United States Department of Labor. Coye did not testify at the trial. Appellees suggest on appeal that the exhibit was admissible under TEX.R.CIV.EVID. 803(8). Rule 803(8) allows admission of:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, or (C) factual findings resulting from an investigation made pursuant to authority granted by law; unless the sources of information or other circumstances indicate lack of trustworthiness.

Appellees contend that the poster is admissible under this rule because the poster is on file with Occupational Safety and Health Administration (OSHA) and has been adopted by the United States Department of Labor. Rule 803(8), however, is applicable only when the exhibit is prepared by public officials or employees under their supervision in the performance of their official duties. *Railroad Commission of Texas v. Rio Grande Valley Gas Co.*, 683 S.W.2d 783, 788 (Tex.App.—Austin 1984, no writ). Documents prepared by private individuals and filed with a governmental agency are not official documents as contemplated by Rule 803(8). *Id.* Even if Dr. Coye was under contract with the United States Department of Labor, she was not shown to be a public official or under the supervision of a public official. Furthermore, the poster does not meet any of the requirements under Rule 803(8) because it does not purport to set forth activities of OSHA or matters observed pursuant to a duty imposed by law or factual findings resulting from an investigation authorized by law. Thus, the poster does not fall within this exception to the hearsay rule.

Appellees further contend that appellants did not properly object at trial to admission of the poster because they did not object to its lack of authentication. However, the party seeking to have hearsay declarations admitted as an exception to the general rule must clearly show that they are within the exception. *Skillern & Sons, Inc. v. Rosen*, 359 S.W.2d 298 (Tex. 1962). Because the poster was inadmissible hearsay, appellees had the burden of establishing a reason for introducing the exhibit. Appellees did not suggest any reason for the introduction of the exhibit except for the truth of the matter stated on the exhibit, and thus, appellants' objection was sufficient to preserve error. We conclude that the trial court erred in admitting the poster into evidence in violation of TEX. R.CIV.EVID. 802.

We must examine the entire record to determine if the admission of this exhibit constituted reversible error. In order for an error to be reversible, we must determine that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. TEX. R.APP.P. 81(b)(1). The main thrust of information contained in the poster is that expo-

sure to asbestos is dangerous. Because this information is basically repetitive of evidence offered by expert witnesses, its admission was not reasonably calculated to cause and probably did not cause the rendition of an improper judgment. Thus, this admission did not constitute reversible error.

## DEPOSITION LIMITATIONS

■ Appellees next contend that the trial court abused its discretion in admitting written deposition testimony of witnesses Virgil M. Evans and James Henry Read. During pretrial discovery, based upon a motion by the appellees, the trial court limited appellants' examination of Evans and Read to fifty cross-questions for the designated liaison counsel and five cross-questions each for the remaining defendants. At the time the discovery dispute arose, the case involved eighteen separate defendants with common interests and defenses. The court appointed the liaison counsel to speak and act on behalf of the defendants. Appellees contended that because of the poor health and age of these witnesses, the court should limit the cross-examination by the appellants. No limit was placed on the appellees. These two witnesses testified concerning appellee Williams' exposure to the asbestos-containing products manufactured by the appellants. Appellants duly objected to the procedure and filed motions to quash the written depositions. They also objected to the answers of Evans and Read upon receiving the deposition transcripts and to the admission of the depositions into evidence at the trial.

· Appellees contended in oral argument that the trial judge had instructed counsel that if they had additional problems they could ask for more questions to be submitted to these witnesses. However, we have found nothing in the record to support this contention. Appellees further contend that because appellants did not make the omitted evidence a part of the record, there is no showing of reversible error. This Court will not require the appellants to have made a bill of exceptions containing evidence that the trial court has prohibited

them from acquiring, but appellants could have submitted additional cross-questions to the trial court to demonstrate that they were deprived of getting needed answers.

■ Appellees correctly point out that mandamus is available for wrongful denial of discovery by the trial court, and the appellants did not seek that remedy. However, the failure to file a writ of mandamus does not prejudice or waive appellants' right to complain on appeal. *Pope v. Stephenson*, 787 S.W.2d 953, 954 (Tex.1990).

■ The failure to allow a party meaningful cross-examination of witnesses is harmful, reversible error. *Fillion v. Osborne*, 585 S.W.2d 842, 845 (Tex.Civ.App.— Houston [1st Dist.] 1979, no writ). The appellants cite *Velasco v. Haberman*, 700 S.W.2d 729 (Tex.App.—San Antonio 1985, no writ), in which the court found that the trial judge's limitation of inquiry regarding adultery and marital fault to no more than five questions was an abuse of discretion. The court found that such a limitation on questions about a relevant issue was an arbitrary and unreasonable restriction on discovery because there was no basis for such a limitation. A trial court has broad discretion as to whether depositions shall be oral or written. *Munden v. Chambless*, 315 S.W.2d 355 (Tex.Civ.App.—Dallas 1958, writ ref'd n.r.e.). Rule 166b(5) of the Texas Rules of Civil Procedure permits the trial court to enter protective orders in the interest of justice as necessary to protect the movant from undue burden.

The liaison counsel submitted only thirty-nine cross-questions, and the only appellant to submit cross-questions to Evans was Flintkote. None of the appellants offered any cross-questions to Read. Until the appellants exhaust the number of questions allotted to them individually and through a liaison counsel, they cannot be heard to complain that they were denied the right to ask additional questions. If the liaison counsel had refused to cooperate with any other counsel for the appellants, then the additional cross-questions available through him would not have counted against that appellant. The record in no

way indicates that there was any complaint about any lack of cooperation by the liaison counsel. Twelve allotted questions were not used by the liaison counsel, and except for Flintkote's five questions to Evans, the other appellants did not use their five allotted questions. Therefore, no harm could have resulted from the trial court's failure to allow more questions. There could be no error until appellants exhausted their allotted questions and were refused additional questions. These points of error are overruled.

## ADMISSIBILITY OF BUILDING CODES AND GOVERNMENT SPECIFICATIONS

■■■ Appellants contend that the trial court erred in excluding exhibits of governmental military specifications requiring the use of asbestos in insulation products and in excluding a portion of Dr. Corwin Hinshaw's testimony that many building codes demanded the use of asbestos.[3] There was no showing that the appellees' jobs involving asbestos exposure were related in any way to governmental or military contracts or that building codes that required the use of asbestos were applicable.

■■■ Appellants contend that this evidence should have been admitted on the exemplary damage issue to show that they were acting in good faith in the manufacturing and supplying of asbestos. The balancing of the utility of the products against their danger does not remove the manufacturer and seller's duty to advise and enlighten the consumer in the safe use of the product. Even when a balancing of the product's utility against its known or foreseeable danger leads to a conclusion that marketing of the product is justified, the seller still has a responsibility to inform the user or consumer of the risk of harm, and failure to give adequate warnings in these circumstances renders the product unreasonably dangerous. *Borel*, 493 F.2d 1076.

The present case focuses on a lack of adequate warnings. The exemplary damages awarded in this case were not based upon the companies' conduct in manufacturing and distributing asbestos, but, according to the wording of the jury questions, was based upon the failure to warn those handling the product of its potential dangers. The evidence concerning government specifications and building codes could have been admitted on the state-of-the-art issues. Its exclusion, however, was not an abuse of discretion by the trial judge because there was considerable evidence admitted about the wide-spread use of asbestos, including testimony that asbestos had over 3,000 industrial uses. These points of error are overruled.

## STATUTE OF LIMITATIONS

Next, appellants contend that the trial court erred in denying their motion for directed verdict based upon their statute of limitations defense against Strong. In reviewing the denial of a motion for a directed verdict for the defendant, the question is whether the evidence adduced at the time the plaintiff rests his case, viewed in the light most favorable to the plaintiff, raises an issue for the jury. *Vance v. My Apartment Steak House*, 677 S.W.2d 480, 483 (Tex.1984).

■■■ In tort liability cases, the statute of limitations period commences when the injured party discovers, or in the exercise of ordinary care, should have discovered, the injury. *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988). Because the injury occurred more than two years before suit was filed, Strong and Pool were required to prove facts sufficient to suspend the operation of the statute of limitations. *Willis*, 760 S.W.2d at 644; *Weaver v. Witt*, 561 S.W.2d 792 (Tex.1977).

■■■ According to the evidence, Strong was examined by the Texas Eastman Company medical department on March 12,

---

**3.** The excluded evidence included the following statement: "Of course it is used for prevention of fire. I'm sure that many, many building codes have demanded the use of asbestos in theaters, for example; theater curtains of asbestos undoubtedly contained or prevented catastrophic fires in theaters. Its' (sic) use in schools as a prevention of fires had undoubtedly saved lives."

1979. This resulted in a chest x-ray report which stated "[f]indings in the chest could be compatible with changes secondary to asbestosis." On February 21, 1983, Texas Eastman gave Strong another physical examination. In connection with this examination, Strong answered a questionnaire in which he checked "yes" in the box indicating that he had a medical condition or problem that he thought was work-related. Three items are listed, the second of which was "pulmonary fibrosis acquired from working with asbestos." When asked whether he read the questionnaire before signing it, Strong answered,

> Well, we never did read them. He just threw them on our desks back then and we just signed them and walked out because we wanted to get out of there because we knew we wasn't going to find out anything anyhow.

Appellants assert that when Strong signed the questionnaire he was charged with knowledge of the report's contents. Appellants contend that Strong was charged with notice as a matter of law, citing *Sutton v. Grogan Supply Co.*, 477 S.W.2d 930 (Tex.Civ.App.—Texarkana 1972, no writ), and *Ussery v. Hollebeke*, 391 S.W.2d 497, 503 (Tex.Civ.App.—El Paso 1965, writ ref'd n.r.e.). In the *Sutton* case, this Court held that when a deed is signed by a party and recorded that party is charged as a matter of law with constructive notice of its content. In the *Ussery* case, the court held that the grantor as a matter of law is charged with the knowledge of the contents of his deed. These cases stand for the general rule that a person signing a contract or a deed cannot later say that he did not read it when he signed it or did not know what it contained. The present case does not involve a deed or contract and such constructive knowledge will not be charged against the signer as a matter of law.

■ Strong testified that he was never told by anyone at Texas Eastman that he had asbestosis. No evidence was offered showing that anyone at Texas Eastman told this to Strong. Also, there was no showing that this notation was on the record at the time Strong signed it. Strong's testimony raised the fact issue about whether he knew or should have known that he had asbestosis. We find that the evidence at the time the plaintiff rested, when viewed in a light most favorable to the plaintiff, raised an issue for the jury. These points of error are overruled.

Appellant Celotex also challenges the jury's finding on this issue as being against the great weight and preponderance of the evidence. In reviewing a great weight argument, because the burden of proof was on the appellants, they must show that the finding of the jury was so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960). In reviewing these points, we will examine all of the evidence in the record that is relevant to the fact being challenged. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex.1989); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). As previously discussed, we have examined the evidence by these standards and find that the finding of the jury was not against the great weight and preponderance of the evidence or manifestly unjust.

■ Garlock contends that the trial court erred in not granting both its motion for directed verdict and its motion for judgment notwithstanding the verdict on the basis of its statute of limitations defense against Pool. We have previously set forth the standard for reviewing a denial of a motion for directed verdict. For appellate purposes, a complaint that the trial court erred in refusing to grant a judgment notwithstanding the verdict, raises only a no evidence point for appellate review. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 241–42 (Tex.1988). Garlock cites the following testimony by Pool to show that Pool was aware of his problem two and a half years before the institution of suit:

> Q And in fact, I think you said earlier in your testimony you had had breathing problems probably even back into the 70's before then.

A Yes, sir.

....

Q And by 1984 you were still having those problems and you thought it might be due to asbestos exposure, didn't you?

A I was having the problem and I was wanting to find out what it was due to.

Q Okay. And that's why you went to see Mr. Houston?

A Well, yes, sir, that's why I went to see Mr. Houston.

Q All right. And then Mr. Houston is the one that sent you down to see Dr. Comstock. We've already talked about that, haven't we?

A Yes, sir.

Q And, of course, you were seen at Dr. Comstock's office in May of 1984; is that correct?

A I don't remember—I don't remember the date, but I agree with it.

....

Q [Reading from Dr. Mann's records] "No hospitalization or been to doctor in over a year. Worked at Texas Eastman for 27 years. Is having a difficult time breathing, states that he has not been able to work much lately due to chest problems. Has been bothered for a long time. Dr. Morris had him in hospital a couple of years ago, told him it was fat. He is thinking he has asbestosis."

A Dr. Morris said?

Q No, that's what Dr. Mann says you were thinking. March 13, 1984.

A I can't go along with that. How could I have diagnosed myself? That's not true. That's untrue.

When asked if he had talked to people at Texas Eastman about his conversation with Dr. Mann, Pool answered that he believed that he did. The record then reflects the following questions and answers:

Q [Reading from Pool's employment record] "States Dr. Mann told him that the reports from Houston said his

problem was asbestos related." Is that correct?

A I worked in asbestos. I don't know about the other part now.

....

Q All right. And you told the people at Texas Eastman on 8–16–84 that Dr. Mann told you that the reports from Houston said your problem was asbestos related?

A Well, I can't say for sure about that.

Q You don't dispute that though; that's in your records.

A I dispute that. I don't know.

▆▆▆ Limitations begin to run from the date when the plaintiff has knowledge of facts, or from the date, in exercise of ordinary care and diligence, he should have discovered the facts. *Hays v. Hall,* 488 S.W.2d 412, 414 (Tex.1972). Pool steadfastly denied throughout his testimony that he had ever received any report or oral statement from Texas Eastman or from any doctor during the time period prior to two years before filing suit that he had asbestosis. When viewed in the light most favorable to the plaintiff, there was evidence creating a fact issue as to whether Pool knew or should have known about his injury. The trial judge properly denied the motions for an instructed verdict and for a judgment notwithstanding the verdict.

POOL'S FUTURE MEDICAL EXPENSES

▆▆▆ Next, appellants contend that there was no evidence or insufficient evidence to support the jury's award of $100,-000 to Pool for future medical expenses.[4] In reviewing no evidence points, the Court considers only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981). Insufficient evidence points require that we consider and weigh all the evidence. *In re King's Estate,* 244 S.W.2d 660.

4. Celotex has only an insufficiency point of error. Owens–Illinois has both a no evidence and

an insufficient evidence point. Other appellants adopted these points of error.

■ Recovery for future medical expenses requires a showing that there is a reasonable probability that such medical expenses will be incurred in the future. *Fisher v. Coastal Transport Co.*, 149 Tex. 224, 230 S.W.2d 522 (1950). The jury question was worded as follows: "Reasonable and necessary Future Medical Expenses which you find that *in Reasonable Probability* he [Pool] will sustain in the Future" (emphasis added).

■ *Likelihood* and *probability* are synonymous. *Robinson v. Argonaut Insurance Co.*, 534 S.W.2d 953, 958 (Tex.Civ. App.—Fort Worth 1976, writ ref'd n.r.e.). The word *probable* conveys a meaning of *more likely than not. See Parker v. Employers Mutual Liability Insurance Co. of Wis.*, 440 S.W.2d 43, 47 (Tex.1969). Quantifying probability, it means a more than fifty percent chance. *See Fidelity & Guaranty Ins. Underwriters v. Gary Douglas Electric*, 48 Ohio App.2d 319, 357 N.E.2d 388, 392 (1974).

Dr. J.D. Britton was the only witness who testified about future medical expenses. He testified that Pool had minimal evidence of an asbestos-related disease, but this was not enough for a diagnosis of asbestosis. He testified that he had found a pleural thickening and that in his opinion Pool had an asbestos-related pleural disease.

In his prognosis for Pool, Dr. Britton testified that he expected Pool to progress but to get worse with time. He further testified that he had informed Pool that he had a high risk of lung cancer and other asbestos cancers because of his heavy exposure to asbestos products. Dr. Britton also testified that for a worker who had never smoked, the amount of asbestos exposure of these workers had increased their risk of lung cancer to five times the average member of the public.

The only specific evidence about Pool's future medical expenses came from Dr. Britton:

Q Doctor, with reference to Mr. Pool's future on medical expenses, in reasonable probability what does the future hold for him?

A My opinion is that it's the same for Mr. Sledge and Mr. Strong.

Q Is he at risk of cancer?

A Yes, sir.

Q Is he at risk of mesothelioma?

A Yes, sir.

Appellants contend that the evidence is insufficient to establish probability on the basis of the following:

Q And on Mr. Pool you don't have a clear diagnosis of pulmonary asbestosis yet, but he has a pleural disease?

A Yes, sir.

Q Now, in reasonable probability a person who has a diagnosis of pulmonary asbestosis, as does Mr. Sledge and Mr. Strong, do they have a more than 50 percent chance of developing cancer from asbestos?

A Yes, sir, they do.

Q Is that recognized in the medical authority and recognized by you as a doctor?

A Yes, sir.

Q And is Mr. Pool's risk of the cancer, is it somewhat less but still has the risk?

A That's, that's correct.

Dr. Britton's previous testimony concerning *Sledge's* medical expenses were as follows:

Q Looking at the future, coming to future medical expenses again, and I might remind you again that in reasonable probability is what we have to deal with, what are the probabilities of his (Sledge) future with reference to medical expenses?

A Again a worst case scenario, development of lung cancer, mesothelioma, continuing heart disease, as a result of his asbestos problems, it could easily exceed $100,000 easily.

. . . .

Q And then of course in the absence of cancer, that can go on down to less?

A That's correct.

Dr. Britton further testified that Pool's risk of lung cancer was going down day-by-day and year-by-year because he had quit

smoking. The doctor also testified as follows about the probability of Pool's getting cancer:

> Q Doctor, on cancer risks, just a couple of questions to see what we can agree on. Men that have been exposed to asbestos occupationally but do not have asbestosis inside the lungs, you'd agree that there's not a fifty percent risk for that type of individual, such as Mr. Pool?
>
> A Someone who has asbestosis?
>
> Q No. Someone who does not have asbestosis even though he's been occupationally exposed, he doesn't have a fifty percent or greater risk of lung cancer, does he?
>
> A He has a less than fifty percent.
>
> Q Okay. And even if that person has the pleural changes, you're not going to pull him over this fifty percent category?
>
> A No.

The term *reasonable probability* is determined by a consideration of the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase. *Insurance Co. of North America v. Myers*, 411 S.W.2d 710 (Tex. 1966). However, viewing the record as a whole, we find that the only testimony concerning Pool's future medical expenses came from Dr. Britton. A careful examination of his testimony shows that he based his testimony of Sledge's future medical expenses on a worst-case scenario in which Sledge would develop lung cancer, mesothelioma and heart disease. Thus, his testimony shows what Pool's medical expenses would be if he developed lung cancer, but in other testimony he limits the possibility that Pool will get cancer to less than a fifty percent chance. This specific testimony quantitating his general statement amounts to a likelihood that Pool will not get cancer. The evidence is not sufficient to establish that Pool's reasonable and necessary future medical expenses in reasonable probability will be $100,000.

No evidence was offered as to what Pool's future medical expenses would be for the asbestos-related pleural disease which he was diagnosed as having. Pool contends that Dr. Britton's testimony [while talking about Strong] that "in the absence of cancer, that [the well over $100,000] can go on down to less" is sufficient evidence to support the award. While specificity is not required, this vague reference is not sufficient to support a $100,000 medical award. While we find this constitutes some evidence, we sustain appellants' point of error that this evidence is insufficient.

## THE AWARD TO OLLIE FREEMAN

In the next point of error, appellant Garlock contends that the trial court abused its discretion by permitting Donna Freeman and Ollie Freeman to file answers to its request for admissions. Specifically, Garlock asserts that Donna Freeman and Ollie Freeman "admitted themselves out of court" by failing to timely respond to its request for admissions and by failing to file a motion to extend time for filing a response within the thirty-day period. TEX. R.CIV.P. 169.

After the expiration of thirty days from the date of service, and in the absence of a motion to extend time for filing a response, the admissions are automatically deemed admitted and the trial court has no discretion to deem, or refuse to deem, the admissions admitted. *Curry v. Clayton*, 715 S.W.2d 77, 79 (Tex.App.— Dallas 1986, no writ); TEX.R.CIV.P. 169. The trial court has broad discretion to permit or deny the withdrawal of deemed admissions when the nonanswering party presents sufficient evidence to establish good cause for his failure to make timely answers to the requested admissions. *Boone v. Texas Employers' Ins. Ass'n*, 790 S.W.2d 683, 688 (Tex.App.—Tyler 1990, no writ). However, the court also must find that the withdrawals can be ordered without causing undue prejudice to the party relying on the admissions and that the presentation of the merits of the action will be subserved by the withdrawal. *Boone*, 790 S.W.2d at 688. The trial court's ruling on the withdrawal will be set aside only upon

a clear showing of abuse. *Employers Ins. of Wausau v. Halton,* 792 S.W.2d 462, 464 (Tex.App.—Dallas 1990, writ denied). An abuse of discretion occurs when the court acts without reference to guiding rules or principles or acts arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985).

In the present case, Garlock filed a request for admissions on August 14, 1989, for plaintiffs Reuben S. Pool, Thomas R. Sledge, Charles W. Strong, Bobbie A. Freeman, Donna G. Freeman and Ollie Freeman. On August 18, 1989, Pool, Sledge, Strong, and Bobbie Freeman filed their responses. Counsel contends, however, that due to a clerical error, Donna Freeman and Ollie Freeman were omitted in the response. On September 21, 1989, eight days after the thirty-day reply period had expired, Donna Freeman and Ollie Freeman filed a motion to answer Garlock's request for admissions, together with their responses, stating that they adopted Bobbie Freeman's answers. During the pretrial hearing, the trial court granted their motion to answer.

■ Garlock argues that a clerical error is insufficient to constitute good cause for failing to file answers to its request for admissions. However, in *Birdo v. Holbrook,* 775 S.W.2d 411, 413 (Tex.App.—Fort Worth 1989, writ denied), the court held that it was not an abuse of discretion to allow counsel additional time to respond to request for admissions when, due to a clerical error, counsel answered "admit" instead of "deny." Good cause can be shown even though a party may have been negligent, if his negligence does not rise to the level of conscious indifference. *Halton,* 792 S.W.2d at 466.

The record does not indicate that counsel in the present case consciously disregarded his obligation to timely file its answers to the requests. Counsel filed responses for plaintiffs Pool, Sledge, Strong, and Bobbie Freeman four days after Garlock filed its request for admissions and filed answers for Donna Freeman and Ollie Freeman eight days after the thirty days had expired. This suggests that he was not attempting to avoid discovery. Furthermore, there was no showing that Garlock was unduly prejudiced by the withdrawal of the deemed admissions. We conclude that the trial court did not abuse its discretion by withdrawing the deemed admissions against Donna Freeman and Ollie Freeman. This point of error is overruled.

■ Appellants next contend that the trial court erred in rendering a judgment in favor of Ollie Freeman because there was no evidence about any person named Ollie Freeman and alternatively, the evidence was insufficient to support the judgment for Ollie Freeman. We will apply the standard for reviewing no evidence points and insufficiency points as previously stated.

Ollie Freeman brought this suit as the surviving mother of Donald Freeman. The voir dire, the opening statements, and the summary of the pleadings and summation identified Ollie Freeman as the mother of Donald Freeman. At trial, Bobbie Freeman, Donald's widow, testified that Donald took care of his eighty-eight-year-old mother. Bobbie stated that Donald would perform various errands for his mother, such as taking her to the doctor and doing repairs for her.

■ In an action by a parent for the death of an adult child, the mother can recover pecuniary benefits, which include such things as labor, services, advice, and counsel, as well as attention in ministering to the wants and needs of the parent. *P.T. & E. Co. v. Beasley,* 698 S.W.App.—Beaumont 1985, writ ref'd n.r.e.). Although Bobbie, in her testimony, did not identify Donald's mother by name, the jury could determine her identity in the context of the trial. The better procedure would have been to identify her by her proper name in the testimony; however, the failure to do so is not fatal. We find that there is sufficient evidence for an award to Donald Freeman's mother, and based upon her status in the proceedings, the jury could properly identify Ollie Freeman as that person. The points of error are overruled.

## THE AWARD TO THE WILLIAMS CHILDREN

■ Next, appellants contend that there was no evidence and, alternatively, insufficient evidence to support the jury's award of $25,000 damages for pecuniary loss and $25,000 damages for termination of parent/child relationship to the Williams children. We have previously discussed the applicable standards of review for addressing these points.

The jury was instructed to consider three elements of damages and make a specific finding on each: (a) pecuniary loss, (b) termination of the parent/child relationship, and (c) mental anguish, past and future, suffered because of the death of their father. No challenge is made to the $50,000 awarded for mental anguish.

The jury also was instructed to "[c]onsider the care, maintenance, support, services, education, advice, counsel, and reasonable contributions of a pecuniary value that [the Williams children] would, in reasonable probability, have received from George Williams, if he had lived." This broad instruction included not only monetary loss, but it asked the jury to value other benefits that the children received from their father.

The instruction regarding the termination of the parent/child relationship directed the jury to "[c]onsider the love, support, companionship, and society that [the Williams children] would, in reasonable probability, have received from George Williams, if he had lived." In determining wrongful death awards, the Texas Supreme Court stated in *Moore v. Lillebo*, 722 S.W.2d 683 (Tex.1986), that factors to be considered could include (1) the relationship between the parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of the family relationship; and (5) common interests and activities.

Only one child, a son, testified about the relationship between the father and the seven children. His testimony was general and included that his father "pushed the children hard" because he wanted them to excel, that he was a good role model, that he was supportive of the children, and that he was always available to help them with their problems. Williams' wife testified that he was a good family man and was good with the children. Although there are no specifics as to the living arrangements, harmony of the family relationship, or interests or activities, there was no negative testimony in this regard. Evidence of a father who is a good role model and who is always around to help his children, with no evidence to the contrary, is sufficient to support the award of damages. The points of error are overruled.

## THE OWENS–ILLINOIS PERCENTAGE OF RESPONSIBILITY

■ In the next point of error, appellant Owens–Illinois challenges the sufficiency of the evidence for rendition of a judgment against it, based upon the jury's finding that it caused twenty-five percent of the asbestos-related injuries to Sledge and Pool. Owens–Illinois contends that this finding is against the great weight and preponderance of the evidence. We have previously set forth the standard of review for addressing this point. The burden was on Owens–Illinois to prove allocation of causation for its contribution. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984).

Owens–Illinois manufactured an insulation product called Kaylo, which was a hydrous calcium silicate that was roughly fifteen percent asbestos. It was used in molded pipe covering form, as well as in a block. Owens–Illinois sold its insulation division to Owens–Corning Fiberglas Corporation effective April 30, 1958. Reuben Pool did not begin work at the Texas Eastman plant until March 18, 1957. Therefore, he had only been employed for a year and forty-two days when Owens–Illinois sold their unit that manufactured Kaylo. Sledge did not begin working for Texas Eastman until 1958 and only overlapped the period of time that Owens–Illinois made and sold Kaylo by two months.

Owens–Illinois thus takes the position that it caused less than one-hundredth of

one percent of Sledge's asbestos-related injury. It cites evidence showing that Sledge was exposed to more than 140 other products that contained asbestos. In the case of Pool, Owens–Illinois cites similar factors and calculates that it should be responsible for less than three one-hundredths of one percent of Pool's asbestos-related injuries. Pool worked with 147 products made by sixteen settling defendants.

There was evidence that Kaylo gave off less than 5,000,000 particles of asbestos per cubic foot (calculated on the basis of forty hours' exposure), but there were no specific figures by which Kaylo can be compared to the products made by the other companies as to how much asbestos the other products contained and how much was given off by each product. There was no medical evidence offered to assist in establishing the percentage of responsibility.

The use and exposure to the Owens–Illinois product cannot logically be said to have terminated on the date that the company quit manufacturing this product. Nothing in the evidence shows how much of the Owens–Illinois product Texas Eastman may have had on hand for later use at that time. Also, much of the exposure to this type of product occurred when it was torn out and replaced. The tearing out and replacement may have been years after the installation of this product. Without these dates, the specific date that the company sold its manufacturing operation does not establish the date that the exposure to the product ended.

Charles Strong testified that large quantities of Kaylo were used at the Texas Eastman plant.[5] Dr. J.D. Britton testified that a short-term exposure to asbestos could be damaging.[6] The argument by Owens–Illinois is flawed in three respects:

(1) their responsibility cannot be based upon exposure time alone;

(2) the time when Owens–Illinois stopped manufacturing Kaylo is not necessarily the same time that Pool and Sledge stopped being exposed to their product; and

(3) there is no showing how the amount of asbestos given off by Kaylo compared with the amount given off by the products of other companies.

The evidence does not offer an evidentiary formula whereby the fact finder could make an exact mathematical calculation of the percentage, and asbestos fibers found in the lungs cannot be traced to a specific product. The burden, however, was on Owens–Illinois to show the percentage of responsibility, and we conclude that the evidence does not establish the percentage figures contended by Owens–Illinois. The jury's finding is not against the great weight and preponderance of the evidence. These points of error are overruled.

**5.** Strong's specific testimony was as follows:

Q Was Kaylo one of the big products—a huge amount of products or small amount?
A It was—we used just worlds of Kaylo insulation.
. . . .
Q Did you use a little or a lot of that Owens–Illinois Kaylo?
A We used a lot.

**6.** Dr. Britton testified as follows:

Well, it's important to recognize that asbestosis is something—is a process that doesn't stop when people are not around asbestos fibers; in fact, it continues. Kind of a strange never ending process, it goes on and on and on and on, even though a person may not be around asbestos any more, and this is characteristic. . . . A lot of people do not remember that they did construction work or that they worked in the ship yards or they were a welder or things along those lines, because somebody may have not had much of an exposure at either their work place or at home that happened 40 years ago. People forget about a job they may have had—they may have worked briefly for two or three days, and so I will really stress this point and talk to people and make sure that the history is complete.

Q In connection with that, we've already seen some medical literature or scientific literature on it where they mentioned that just a small amount or small period of exposure years ago can be important as a disease producer. Do you recognize that?
A No doubt. Actually, a brief exposure, perhaps one day can stimulate some degree of process.
Q I guess what you're telling us then that the—how many years it's been since your first exposure and then the total amount of the exposure both are important?
A That's correct.

## THE CONSTITUTIONALITY OF PUNITIVE DAMAGES

■ Appellants next contend that the award of punitive damages violates the due process clauses of the United States Constitution and the Texas Constitution, the excessive fines clause of the Texas Constitution, and the common law of Texas. Appellants have not sought a remittitur to reduce the amount of the punitive damages award.

In *Pacific Mutual Ins. Co. v. Haslip*, 553 So.2d 537 (Ala.1989), *aff'd* — U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the United States Supreme Court held that punitive damage awards do not violate the due process provision of the fourteenth amendment when the award is based on an objective criterion. The Supreme Court conceded that unlimited jury or judicial discretion in the fixing of punitive damages may invite extreme results that are unacceptable under the due process clause. *Id.* Therefore, the general concerns of reasonableness and adequate guidance from the court must be considered in determining whether punitive damages are unconstitutional. *Id.*

In the present case, the trial court's instruction placed reasonable constraints on the exercise of the jury's discretion by defining exemplary damages as an amount awarded to set an example to others and as a penalty. The charge also required the jury to find that appellants' acts were done "willfully, intentionally, or with a callous or reckless and heedless disregard and indifference to the rights, welfare, or safety of the persons affected by it" before awarding exemplary damages to the appellees. We conclude that the punitive damage award was based on an objective criterion, and thus, the due process provision of the fourteenth amendment was not violated.

■ The United States Supreme Court held in *Browning-Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), that the excessive fines clause of the eighth amendment does not apply to awards of punitive damages in civil cases between private parties. The Texas Supreme Court has held that a civil penalty is excessive, and thus unconstitutional, when it becomes so manifestly violative of the constitutional prohibition against excessive fines as to shock the sense of mankind. *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex.1980).

■ In the *Pennington* case, the Texas Supreme Court considered whether punitive damages violated Article 1, § 13 (excessive fines) of the Texas Constitution and the fourteenth amendment (due process) of the United States Constitution. The court held that whether such damages are excessive is determined by whether it was fixed with reference to the object it is to accomplish according to the seriousness of the wrong and the defendant's culpability.[7]

This constitutional test is in conformity with the factors for determining if a punitive damages award is excessive, set forth by the court in *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). Pursuant to the *Alamo National Bank* decision, the trial court must consider (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties, and (5) the extent to which the defendant's conduct offends the public's sense of justice and propriety.

Appellant Owens–Illinois argues that the award of punitive damages punishes today's shareholders, management and employees for "the alleged sins of management in place forty to fifty years ago." The law recognizes Owens–Illinois as a corporate entity, and as such it must be liable for its damages. Its liability cannot be diminished or removed each time there is a change in management or employees or stock is sold.

Owens–Illinois contends that it is now litigating more than 70,000 asbestos claims

---

**7.** The Corpus Christi Court of Appeals recently held in *Celotex Corp. v. Tate* that in the absence of any state action, the excessive fines provision of the Texas Constitution does not apply to an award of common law punitive damages. *Celotex Corp. v. Tate*, 797 S.W.2d 197, 208 (Tex. App.—Corpus Christi 1990, no writ).

and that it left the asbestos-containing insulation business more than thirty years ago. It points out that the Fifth Circuit stated, "the scope of this mass litigation is without precedent and practically without dimension." *Jackson v. Johns–Manville Sales Corp.*, 727 F.2d 506, 524–25 (5th Cir. 1984), *rehearing en banc,* 750 F.2d 1314 (1985), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). The evidence, however, also indicates that a unprecedented number of workers will die from asbestos-related cancer.

The wrongful conduct was a failure to warn about the use of a product which could result in serious illness and death by suffocation, and we cannot conclude that punitive damages of an approximately one-to-one ratio with actual damages are such that would shock the sense of mankind. In relationship to the actual damages and the nature of the wrong, as well as the other factors, the record supports the award of punitive damages.

■ Fibreboard and Owens–Illinois contend that we must look at the multiple imposition of punitive damages against defendants in asbestos cases. They contend that substantive due process prevents multiple imposition of punitive damages for the same conduct or course of conduct, citing *Racich v. Celotex Corp.*, 887 F.2d 393 (2d Cir.1989); *In re School Asbestos Litigation,* 789 F.2d 996 (3rd Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986); *King v. Armstrong World Industries, Inc.,* 906 F.2d 1022 (5th Cir.1990). While the courts in these cases discuss in some detail the problems inherent in allowing punitive damages in the voluminous asbestos cases, none of the courts has held that awarding such damages violates substantive due process.

The thrust of the appellants' argument is that repeated punitive damages awards in numerous cases go beyond punishment and allow windfalls for the plaintiffs. They also endanger the rights of future claimants to recover actual damages. Owens–Illinois contends in its brief that it has been subjected to punitive damage awards of more than $4,000,000 for its manufacture and sale of Kaylo insulation products. While we recognize that there are numerous cases that have been decided and numerous cases are pending concerning damages claims based upon exposure to asbestos, this Court cannot dictate policy in a mass tort context, but can only decide the cases involved in the present suit. Such broad policy considerations are left to the Supreme Court of this state and the United States and to the appropriate legislative bodies.

We find no constitutional violations and no support or authorities for the appellants' contention that the punitive damages award violated the common law. Every state and federal court that has considered the question of whether punitive damages are unconstitutional has ruled that the common-law method for assessing punitive damages does not in itself violate due process. *Pacific Mutual Ins. Co.,* 553 So.2d 537, *aff'd* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1. These points of error are overruled.

### GARLOCK'S LIABILITY

■ In the next point of error, appellant Garlock contends that there was no evidence or insufficient evidence to show that the products manufactured by Garlock were defective, unreasonably dangerous, and contributed to the injuries of Pool, Strong, Sledge, and Freeman. We shall apply the standards for reviewing no evidence and insufficient evidence points as previously stated.

■ Garlock contends that their products are not unreasonably dangerous and, therefore, are not defective. Garlock contends that it had no duty to warn of dangers which did not exist. Garlock has never manufactured or sold asbestos insulation. This company manufactures gaskets and valve packing, some of which contain small amounts of asbestos in rubber, elastomers, and lubricants. The evidence shows that these products in their initial application release no asbestos particles into the air, but a small number of particles may be released when it is cut. The amount of asbestos released is far below

the government standard. The court held in *Gideon,* 761 F.2d 1129, that compliance with government safety standards constitutes strong and substantial evidence that a product is not defective. The federal courts have used this standard on the basis that they were applying Texas law, but we have found no Texas cases, other than diversity cases in federal court, to so hold. *See Lorenz v. Celotex Corp.,* 896 F.2d 148 (5th Cir.1990). Under Texas law, a manufacturer's compliance with a government safety standard does not automatically preclude a finding of liability.

Appellees point to evidence from an article published in 1931 in a journal called *Safety Engineering.* The article, "The Very Least An Employer Should Know About Dust and Fume Diseases" indicated that exposure to asbestos in any form is dangerous. They also point to evidence from the expert witness, Dr. Joseph Wagner, in which he stated that it was known in the 1920's that asbestos is a disease-causing mineral which causes asbestosis and also many types of cancer, including lung cancer, pleural mesothelioma, and perierdial mesothelioma. The evidence also showed that there is no safe level of asbestos exposure.

 Manufacturers that know or should know of potential harms to a user because of the nature of their products are required to give adequate warnings of such dangers. *Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978). When a product contains toxic or dangerous ingredients not obvious to the typical user, the manufacturer has a duty to know the danger and to issue an appropriate warning. *Muncy v. Magnolia Chemical Co.,* 437 S.W.2d 15 (Tex.Civ.App.—Amarillo 1968, writ ref'd n.r.e.). Section 402A, comment K of the Restatement of Torts defines an unavoidably unsafe product as those that are incapable of being made safe for their ordinary and intended use according to the scientific knowledge known at that time, and the failure to give adequate warnings under these circumstances renders the product unreasonably dangerous. *Borel,* 493 F.2d at 1089; RESTATEMENT (SECOND) OF TORTS § 402A, comment K (1965). A product, therefore, can be defective if the design is not sufficiently safe or if the product does not have adequate instructions or warnings. *Carter v. Massey–Ferguson, Inc.,* 716 F.2d 344, 346 n. 1 (5th Cir.1983). When a product has no warning, a presumption exists that the plaintiff would have read and heeded a proper warning had one been given. *Howard v. Faberge, Inc.,* 679 S.W.2d 644, 650 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

The record contains testimony from Charles Strong, who worked at Texas Eastman, and Charles Flint, the purchasing agent for Texas Eastman, that Texas Eastman purchased and used Garlock products consisting of asbestos sheet packing and square-braided asbestos packing. Strong testified that Garlock products had to be replaced and when being replaced were dusty. Strong also testified that when removing the worn-out packing material, it was necessary to scrape, beat and pull on it. There was testimony that the asbestos sheet packing had to be cut to be used and was used in all the buildings in Texas Eastman. He further testified that every time the material was cut, dust and fibers were released. Although there was no expert testimony concerning the contents of the dust, the jury could infer that the dust formed from a material containing asbestos would also contain asbestos.

There was expert testimony that the cumulative exposure to asbestos causes asbestos-related diseases and that even the inhaling of small amounts of asbestos can contribute to the disease process. There also was evidence that Garlock failed to warn the appellees of the dangers of their products and that the appellees' injuries were caused by exposure to asbestos. We find that there was sufficient evidence to support the findings against Garlock. These points of error are overruled.

### FLINTKOTE'S LIABILITY

 Next, appellant Flintkote contends that the evidence was insufficient to support the jury verdict against Flintkote. Flintkote challenges the evidence on the

basis that its products did not pose any danger nor did Flintkote know or have any reason to know of any supposed danger in its products. We have previously discussed the applicable standard for review. Flintkote cites the fact that there was no evidence concerning any danger from liquid asbestos products that Flintkote manufactured. Flintkote states the fact that none of the experts mentioned Flintkote by name or referred to any liquid products. It also argues that most of the expert testimony referred to raw asbestos and asbestos insulation products. The testimony showed that Flintkote products were used as adhesives and joint compounds to seal joints and to place a thermal coat over the pipe insulation. The product came premixed in a liquid form in five-gallon buckets or fifty-five-gallon drums and in that form emitted no dust.

It cannot be presumed that all asbestos-containing products are unreasonably dangerous or that all companies have a duty to warn of supposed dangers. *Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 347 (5th Cir.1982); *Migues v. Fibreboard Corp.*, 662 F.2d 1182, 1188–89 (5th Cir.1981).

Flintkote is correct that there was no expert testimony specifically stating that the Flintkote products emitted a dust containing asbestos fibers. There was no dispute that the Flintkote product was liquid at the time of its application. Strong testified as follows:

> Flintkote made some adhesion compound, they also made some joint compound, they also made a thermal coat which we used everyday.... It was waterproofing cement that we put on elbows, on vessels, after we had insulated them with regular cement for weatherproofing. When this stuff dried and you went back to tear it off is where you got your problem.
>
> ....
>
> You got dust and stuff flying. *Anything that dries in asbestos, it forms a solid substance* that when you start beating it with hammers or stuff like that, you got dust from it.
>
> ....
>
> Q Was there any way to escape that dust if you were working with it?
> A Oh, no, sir. Not in the areas we had to work in with it.

(Emphasis added.)

The evidence shows that Flintkote did not warn the appellees of the dangers of asbestos and that it did not test its products for the harmful effects of asbestos. There was sufficient evidence to show that the appellees inhaled the dried Flintkote product when it became dust and that the product contained asbestos. The jury had before it expert testimony showing the dangers of inhaling asbestos products.

Flintkote specifically argues that the evidence did not show that George Williams worked with Flintkote products. James Henry Read testified, "I remember the Flintkote name but I'm not sure about their product. I'm just not sure about that one. I know we used some cements put out by them and some insulation coatings." The testimony indicates that Williams worked at Texas Eastman as an ironworker and insulator, and thus the jury could have inferred that he was exposed to the same products as the other appellants working at that job site. This included the Flintkote products.

Both Garlock and Flintkote contend that if the appellees suffered from asbestos-related injuries, the causation was obviously the dust from the crumbling insulation products of other companies. However, the record is undisputed that their products also emitted a dust after it became dry and that such dust was inhaled by the workers when removing their products. The emission of asbestos dust when removing the dried products was a forseeable problem. The testimony about how little asbestos the product gave off in its initial form did not refer to the emission of dust during the removal of these products. The points of error are overruled.

## PUNITIVE DAMAGES AGAINST GARLOCK, FLINTKOTE, AND FIBREBOARD

Appellants Garlock, Flintkote, and Fibreboard contend that there was no

evidence or, alternatively, that there was insufficient evidence to support the jury findings of punitive damages. Punitive damages are assessed to punish the mental attitude of the defendant, as opposed to its conduct. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). A plaintiff may prove the defendant's gross negligence by either showing: (1) that the defendant had actual subjective knowledge that his conduct created an extreme degree of risk; or (2) that under the surrounding circumstances, a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others. *Williams v. Steves Industries*, 699 S.W.2d 570 (Tex.1985). It is not necessary to prove a defendant's subjective state of mind by direct evidence. *Williams*, 699 S.W.2d 570. There is ample evidence in the record to show that as early as the 1920's there was a general knowledge among the manufacturers in the asbestos industry concerning the dangers of asbestos. Most of the evidence pertained to asbestos insulation and raw asbestos. Although there was no direct evidence that Fibreboard was aware of these dangers, the jury had sufficient evidence under a reasonable person standard to have inferred that these companies had knowledge of the dangers of asbestos. Fibreboard manufactured an insulation product which inherently produced a dust with high levels of asbestos. From the surrounding circumstances, the jury had sufficient evidence to infer that Fibreboard's decision not to warn the users of the dangers of its products was made with conscious indifference to the potential injuries to the users and that this conduct created an extreme risk.

■■■ The evidence indicates that the products made by Garlock produced a very small amount of asbestos fibers, and at all times the amount of fibers was far below the governmental standards (1,000 times safer than the 1972 OSHA regulation and 40 times safer than the current OSHA regulation). This included the standard adopted by the State of Texas in 1958. Appellees correctly contend that Garlock had an affirmative duty, commensurate with the potential dangers, to test its prod-

ucts before selling them. *Dartez*, 765 F.2d 456. Appellees contend that because Garlock did not test its products until 1983, it was grossly negligent. The record does show that Garlock conducted a study of its products in 1983; however, it does not support the appellees' position that this was the earliest study made by Garlock. The record further established that studies of similar products were made by other entities, which showed that the concentration of asbestos fibers was extremely low. We find no evidence of surrounding circumstances that rises to the level that is required to show that Garlock made a conscious decision not to warn about the dangers of its products.

■■■ Flintkote has not pointed out any evidence that the levels of asbestos in its products met any standard, but it contends that as a liquid product it did not emit any respirable asbestos fibers. As previously discussed, there is evidence that shows that its product could be inhaled once it becomes dry and powders into dust. Although Flintkote was aware that its company manufactured a product containing asbestos, it admitted that it had never conducted a study as to the level of asbestos fibers that might be emitted into the air in the process of removing this dried product. Its conduct, therefore, could have been found by the jury to have been one of conscious indifference to those who worked with the product. Thus, there was sufficient evidence from the surrounding circumstances to support the jury's findings of gross negligence on the part of Fibreboard and Flintkote. This point of error is overruled as to Fibreboard and Flintkote. Because there was no evidence that rose to the level of showing a conscious indifference on the part of Garlock, the point of error is sustained, and the exemplary damages awarded against it will be set aside.

## FLINTKOTE'S OPENING STATEMENT

■■■ Appellant Flintkote next contends that the trial court erred in refusing to allow it to make an opening statement to the jury at the beginning of its case-in-

chief. The proper limitation of the opening statement is a matter within the discretion of the trial court, subject to review only for abuse of discretion. *Ranger Insurance Co. v. Rogers,* 530 S.W.2d 162, 170 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.).

Flintkote contends that the ruling of the trial court that the appellants could not split their opening statement denied it an opportunity to point out to the jury the difference between its liquid products and the insulation products of the other defendants while the plaintiffs' evidence was still fresh in the jury's mind. Rule 265 of the Texas Rules of Civil Procedure sets forth the order in which a trial is to proceed. Section (a) permits the party adverse to the plaintiff to make an opening statement prior to either side introducing any evidence, or a party may come under section (c) and make an opening statement prior to the introduction of evidence by the adverse party. The trial court did not rule that the defendants could not exercise either option, but ruled that they could not do both by having some defendants speak at the beginning of the trial and others later on in the proceeding. In a trial involving numerous parties, this ruling was not an abuse of discretion. Furthermore, Flintkote did not object to the ruling when it was made, and thus did not preserve the right to complain about the error, if any. The point of error is overruled.

## JURY QUESTIONS ON SETTLING AND NONSETTLING DEFENDANTS

██ Appellants next contend that the trial court erred in submitting two identical sets of jury questions regarding liability and causation based on the status of the defendants, settling or nonsettling. In the first set of questions, the nonsettling defendants were referred to as defendants and in the second set of questions, the settling defendants were referred to as companies. Appellants objected to this double submission and requested that one set of questions, listing all defendants alphabetically, be submitted.

The Texas Supreme Court has held that the submission of multiple issues raising the same factual inquiries, whether identical in language or merely in form, is erroneous. *Holmes v. J.C. Penny Co.,* 382 S.W.2d 472, 473 (Tex.1964). In *Holmes,* the court was concerned with a multiple submission of a single theory of recovery by slightly varying jury questions, all of which raised the same factual inquiry. In the present case, the same factual inquiries were submitted against each asbestos manufacturer only once. Furthermore, the jury was aware of the identities of the parties to the litigation, and the separation into two issues reflected those identities and could not be deemed to imply anything else. In addition, the settling and nonsettling defendants were listed together in one issue for the jury's determination of each party's percentage of comparative causation. *See Duncan,* 665 S.W.2d at 427, n. 8. The trial court did not err in separating the issues as to settling and nonsettling defendants. The points of error are overruled.

██ In the next points of error, appellants contend that the jury's answers to Questions No. 8 and 16 are against the great weight and preponderance of the evidence. We have previously discussed the applicable standard of review for addressing this point. In Question No. 16, the jury apportioned twenty percent of liability to two settling defendants (Owens–Corning Fiberglas and Baldwin–Ehret–Hill) which were found in Question No. 8 to have supplied asbestos-containing products causing appellees' injuries. Appellants urge that a new trial should be granted because the jury failed to find any exposure or liability with respect to sixteen defendants that either settled with the plaintiffs or were absent from the trial.

██ A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused their injury. *Gaulding,* 772 S.W.2d at 68. If there is sufficient evidence presented by appellees showing that appellants supplied *any* of the asbestos to which appellees were exposed, then appellees have adequately met their burden of proof. *Celotex Corp. v. Tate,* 797 S.W.2d 197, 204 (Tex.

App.—Corpus Christi 1990, no writ). When the plaintiff's injuries are not necessarily caused by one defendant's products, the burden of proof as to apportionment shifts to the defendants. *Celotex Corp. v. Tate,* 797 S.W.2d at 204; RESTATEMENT (SECOND) OF TORTS § 433B(2) (1965).[8] If any defendant is held strictly liable, all defendants shall be liable to the plaintiff jointly and severally for the entire amount, but as among themselves, each of the defendants is to be held liable only for its percentage share in causing the injury. *Moore v. Johns–Manville Sales Corp.,* 781 F.2d 1061, 1063 (5th Cir.1986); *Duncan,* 665 S.W.2d 414.

In the present case, the evidence reflects that while working at Texas Eastman appellees were exposed to asbestos-containing products manufactured by appellants. Appellee Strong specifically identified using products manufactured by all of the appellants, as well as Owens–Corning Fiberglas and Baldwin–Ehret–Hill. Sledge and Pool also testified to using these products.

The deposition testimony of witnesses Virgil M. Evans and James Henry Read established identification of the asbestos-containing products to which Williams was exposed. Evans and Read stated that Williams used products manufactured by all appellants, except Garlock, Owens–Corning Fiberglas, Baldwin–Ehret–Hill, and Eagle–Pincher Industries. As to the other manufacturers, Evans and Read either had conflicting testimony or they were uncertain whether Williams had used any of the products.

As stated *supra,* no evidentiary formula was presented for the jury to make an exact mathematical calculation of the percentage of asbestos contained in each manufacturer's products. Appellants had the burden to show the percentage of causation to be allocated to each manufacturer. We conclude that the finding of the jury was not so against the great weight and preponderance of the evidence as to be

unjust. These points of error are overruled.

## RELEVANCE OF DEPOSITIONS TO FLINTKOTE AND GARLOCK

Appellants contend that the trial court committed error by admitting without limiting instruction five depositions taken in cases in which Flintkote and Garlock were not parties and which had no relevance to Flintkote and Garlock.

At trial, Flintkote and Garlock objected to the depositions on the basis that they were not relevant and were highly prejudicial because Flintkote and Garlock did not manufacture insulation products. Flintkote correctly points out that the deposition of Dr. Kenneth Smith discusses the dangers known to Johns–Manville; that the deposition of Dr. Barry Castleman discusses the knowledge of Owens–Illinois regarding the dangers posed by asbestos dust from their products; that the deposition of Dr. Thomas Mancuso relates to the dangers of Philip Carey Insulation products; that the deposition of Dr. Arthur Mueller is testimony showing that Mueller was unaware of the dangers explained by Mancuso; and that the deposition of Dr. Richard Gaze concerns Pittsburgh Corning's knowledge of the dangers of asbestos. All of these depositions are relevant to show the knowledge in the industry generally of the dangers of asbestos and are admissible on that issue.

Garlock asked for a limiting instruction to the effect that this evidence was not to be considered for any purpose against Garlock at the trial. Flintkote adopted that motion. The trial judge correctly denied the motion because the evidence was admissible and relevant to what scientific knowledge was available to those companies at that time in regard to the dangers of asbestos. These points of error are overruled.

---

**8.** RESTATEMENT (SECOND) OF TORTS § 433B(2) (1965) states that:

Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to

limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

Garlock also complains that these depositions were inadmissible as hearsay because they were taken in a suit in which Garlock was not a party. The only hearsay objection made to any of these depositions during the trial was by the attorney for Celotex, who objected to the depositions of Dr. Kenneth Smith and Richard Gaze on the basis of hearsay. The trial court permitted an objection by any of the attorneys to inure to the benefit of the other attorneys. However, Garlock has presented no argument, discussion, or authorities concerning its complaint about the hearsay objection. This point of error is overruled.

## WORDING OF JURY QUESTION ON PUNITIVE DAMAGES

■ Next, appellants contend that the trial court erred in submitting the jury questions relating to the assessment of punitive damages "for the injuries of" appellees Pool, Sledge, and Strong and "for the death of" Freeman and Williams. They argue that this question permits a double recovery for compensatory damages by focusing the jury's attention on the appellees and their injuries rather than on the misconduct of the appellants.[9] Furthermore, they argue that the question assumes the appellees sustained injuries for which each company should pay and that this amounts to an impermissible comment on the weight of the evidence and assumes the truth of material, controverted facts. *See Alvarez v. Missouri–Kansas–Texas Railroad Co.,* 683 S.W.2d 375, 377 (Tex.1984).

■ Special issues are to be worded so as to avoid assuming the truth of a material, controverted fact. *Alvarez,* 683 S.W.2d 375. The charge in the present case did not predicate the damage questions on affirmative findings of liability, but the questions did contain the savings clause "if any." The phrase "if any" was used twice in the jury issue in question, once stating "for his injuries, if any, ..." and again "Answer separately in dollars and cents, if any,...." The use of this term neutralizes the language which the appellates contend constituted a comment by the court on the weight of the evidence. *See Sharpe v. Safway Scaffolds Co. of Houston,* 687 S.W.2d 386 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Pace v. Gutierrez,* 492 S.W.2d 356 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.); *Loughry v. Hodges,* 215 S.W.2d 669 (Tex.Civ.App.—Fort Worth 1948, writ ref'd n.r.e.).

Appellants are correct that the punitive damages are for the misconduct, *Graham v. Roder,* 5 Tex. 141 (1849); *Interfirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882 (Tex.App.—Texarkana 1987, no writ), but it is difficult to believe that the jury was misled. The definition of exemplary damages instructed the jury that these damages were to be an example to others and a penalty or a punishment and that the amount is in addition to actual damages. Under the terms of this definition, it is difficult to believe that the jury could base its findings on anything other than the conduct which caused the injuries. The jury questions on Freeman and Williams follow the standard format of 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 81.06, 82.03 (1990), which ask what sum of money should be assessed against the defendant "as exemplary damages for the death of [name]?" This language is similar to the language used in the present case asking for exemplary damages for the injuries of Pool, Sledge, and Strong. This language does not focus the jury's attention on the appellees and their injuries to such an extent that it led to double recovery. There is no error. The point of error is overruled.

## THE ADMISSIBILITY OF THE CANTLON LETTER

■ Appellant Celotex next contends that the trial court erred in refusing to

---

9. An example of the question which is the subject of the appellants' complaint is as follows:
 Find from a preponderance of the evidence what sum of money, if any, should be assessed against each of such companies as exemplary damages for the injuries of Reuben Pool.

"EXEMPLARY DAMAGES" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount you may have found as actual damages.

admit a letter written by John Cantlon to Michael Cojohn. The appellees objected to the letter as being hearsay. The letter was offered for the truth of the matter stated therein, but Celotex contends that it falls within exceptions to the hearsay rule because it was essential to rebut evidence offered by appellees and because it qualifies as an ancient document. Celotex points to the fact that a number of letters by Cantlon were introduced by the appellees in Dr. Mancuso's deposition testimony. However, no objections were made to the introduction of these letters. To qualify as an ancient document under TEX.R.CIV.EVID. 901(b)(8), the evidence must show that the document is in such condition as to create no suspicion concerning its authenticity, that it was in a place where it would likely be if it were authentic, and that it has been in existence twenty years or more at the time it is offered. If such a predicate is laid, it is admissible as an exception to the hearsay rule under TEX.R.CIV.EVID. 803(16). No predicate was laid as to where this letter had been kept, and therefore, it did not qualify under the ancient document rule. The point of error is overruled.

## EXCLUSION OF EVIDENCE ABOUT INSOLVENT DEFENDANTS

■ In the next point of error, appellant Flintkote contends that the trial court erred in excluding its offer of evidence regarding Johns–Manville [10] and other companies. Flintkote contends that by this evidence it could have shown that Johns–Manville, and not Flintkote, caused injuries to the appellees. Flintkote contends that if the jury had heard about the appellees' extensive exposure to Johns–Manville products, the fact finder would have reached the conclusion that any exposure to Flintkote's products was *de minimis* and thus no causal factor of appellees' injuries. Appellees take the position that Johns–Man-

ville was in bankruptcy court, that any claims for contribution from that company should be asserted by the defendants in the bankruptcy, and that its insolvency must be borne by the solvent tortfeasors.

■ In *Duncan*, 665 S.W.2d 414, the Texas Supreme Court determined that the defendants in a products liability case were to be jointly and severally liable for the entire amount that the plaintiff is entitled to recover, subject to the right of contribution. Thus, the insolvency of co-tortfeasors must be borne by the solvent co-tortfeasors.

In the case of *Gideon*, 761 F.2d 1129, the court held that evidence of the plaintiff's exposure to products of insolvent manufacturers was not material to the litigation, so long as the jury found that the products of each solvent defendant was a producing cause of the plaintiff's injury and that rights between the solvent and insolvent defendants would be determined in some subsequent proceedings. In a contrary holding, in *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858 (5th Cir.1983), the court held that it was reversible error not to admit evidence about an employer's conduct in a products liability proceeding to allow the manufacturer to show the employer's responsibility for the injury. The plaintiff argued in that case that the conduct of the employer could not be the sole cause of her injuries, but the court held that this was a defense which the defendants were entitled to assert. In the case of *Herrera v. FMC Corp.*, 672 S.W.2d 5 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), the court held that evidence offered by the manufacturer about the conduct of the employer (who was not a party to the suit) was properly admitted to support the manufacturer's allegation that the sole proximate cause of the plaintiff's inju-

---

**10.** Owens–Illinois states in a footnote that the trial court denied its motion to sue Johns–Manville trust, but this was not complained about in a point of error. A third-party petition is in the record against Johns–Manville Corporation Asbestos Disease Compensation Fund with a certificate of service dated August 14, 1989. An order overruling Defendants' Motion to Join Third

Party Defendant Johns–Manville was signed by the court September 8, 1989. The plaintiffs never named Johns–Manville in any form as a defendant. On October 25, 1989, the court signed an Order of Dismissal As To Johns–Manville Sales Corporation, Manville Personal Injury Settlement Trust, Manville Corporation And All Its Entities And Thorpe Products Company.

ry was the misuse or abuse of the manufactured product.

In the case of *Laney v. Celotex Corp.,* 901 F.2d 1319 (6th Cir.1990), the court found that the trial court erred in not allowing the defendant to offer testimony as to the fiber content of other asbestos products of companies not a party to the suit. The court found that the defendant could rebut the plaintiff's theory that the defendant's product was a substantial factor in causing the plaintiff's injury by offering evidence of exposure to another company's product. The court held that this evidence went to the fundamental question of cause and allowed the jury to consider all the contributing factors to determine which, if any, were substantial factors in causing the plaintiff's injury. In the *Laney* case, the court found that the trial court abused its discretion in excluding this evidence under TEX.R.CIV.EVID. 403. Rule 403 permits the trial court to exclude relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues or if the evidence would mislead the jury.

▮ We agree with the court in *Laney* that it was an abuse of discretion to exclude testimony about causation, even if it pertained to insolvent parties. However, we must determine whether this exclusion in the present case constituted reversible error pursuant to TEX.R.APP.P. 81(b), which requires that the error be such a denial of the appellant's rights as to have been reasonably calculated to cause and probably did cause a rendition of an improper judgment.

Flintkote did not contend or plead at the trial that Johns–Manville or the other insolvent companies were the sole cause of the plaintiffs' injuries, but it did plead generally that their injuries were "due solely to disease and/or other causes for which this defendant is not responsible." No evidence was offered in the bill of exceptions to establish that Johns–Manville and the other insolvent companies were the sole cause of the injuries. The bill of exceptions was comprised of Strong's testimony that he breathed the asbestos products of the insolvent companies just as he had breathed the products of the defendants. The evidence showed that these insolvent companies were joint tortfeasors with the defendants, and the evidence would not have supported a fact-finding that the insolvent defendants were the sole cause of the plaintiffs' injuries. A finding by the jury that these insolvent companies were joint tortfeasors contributing to the plaintiffs' injuries would not in any way mitigate the liability of the appellants. Therefore, the failure of the trial court to admit this evidence was not reversible error.

▮ The record shows that the trial judge took judicial notice of the bankruptcy. Pursuant to Rule 201 of the Texas Rules of Civil Evidence, the court can take judicial notice of a fact which is not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. The bankruptcy status of Johns–Manville was capable of accurate and ready determination by inquiry to the bankruptcy court. There were no objections to the trial court's taking judicial notice of this matter, although there were a number of withdrawals from the initial stipulation. There is nothing in the record to show that the court's taking of judicial notice was incorrect. The point of error is overruled.

### CUMULATIVE ERROR

▮ Appellants contend that the cumulative effect of errors in the case deprived them of their right to a fair trial and due process under the law. When several errors exist but are not considered reversible, all errors considered together could present cumulative error requiring reversal. *Klein v. Sporting Goods, Inc.,* 772 S.W.2d 173, 179 (Tex.App.—Houston [14th Dist.] 1989, no writ). To determine if a cumulation of errors denied the appellants their right to a fair trial and due process of law, all errors in the case will be considered along with the record as a whole to determine if the errors collectively were calcu-

lated to cause and probably did cause the rendition of an improper judgment. *See* TEX.R.APP.P. 81(b)(1).

Garlock attached a chart showing that the trial court sustained a much higher number of appellees' objections than it did appellants' and that the trial court overruled far more of the appellants' objections than it did the appellees'. The sustaining and overruling of objections is not done by quotas, but must be based upon the merit of each objection. On appeal, this Court must consider only those errors which we have found to have been preserved. There are few errorless trials, especially those of the length of this proceeding. We have reviewed the record, and we do not find cumulative errors that would have probably caused the jury to have rendered a verdict in favor of the appellants. This point of error is overruled.

We, therefore affirm the judgment in Cause No. 6–90–022–CV (pertaining to Williams only). In Cause No. 6–90–014–CV (pertaining to Pool, Strong, Sledge, and Freeman), because an insufficient evidence point has been sustained on the award of future medical for Pool, Pool's cause of action must be severed and remanded for a new trial on all issues, unless Pool elects to make a voluntary remittitur of $100,000 (the amount of the future medical award) under TEX.R.APP.P. 85(e). If Pool elects to make a remittitur within fifteen days, the judgment for the remainder of damages for Pool will be affirmed, except for the exemplary damages against Garlock. If Pool does not file a remittitur, the judgment on Pool's cause of action will be severed and remanded for a new trial on all issues. The exemplary damages against Garlock are hereby set aside as to all parties. The remainder of the judgment in Cause No. 6–90–014–CV is affirmed.